UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

| | | |
|---|---|---|
| In Re: | ) | CASE NO. 20-10247 |
| | ) | |
| Randolph Hospital, Inc. d/b/a Randolph Health, | ) ) | CHAPTER 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In Re: | ) | CASE NO. 20-10248 |
| | ) | |
| Randolph Specialty Practice Group, | ) | CHAPTER 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| In re: | ) | CASE NO. 20-10249 |
| | ) | |
| MRI of Asheboro, LLC, d/b/a Randolph MRI Center, | ) ) | CHAPTER 11 |
| | ) | (Joint Administration Requested) |
| Debtor. | ) | |

## AFFIDAVIT OF LOUIS E. ROBICHAUX IV IN SUPPORT OF THE DEBTORS' CHAPTER 11 FILINGS AND FIRST DAY MOTIONS

PERSONALLY APPEARED BEFORE ME, Louis E. Robichaux IV, who, first being duly sworn, deposes and says as follows:

1.      I am the Chief Restructuring Officer of Randolph Hospital, Inc. d/b/a Randolph Health ("Randolph"), a nonprofit corporation, which along with two of its affiliates, are the above captioned debtors in possession (individually, a "Debtor" and collectively, the "Debtors"). In this capacity, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, books and records.

1

2.      Due to ongoing financial challenges and in order to effectuate a sale of their assets or other affiliation transaction(s), the Debtors filed their voluntary petitions for relief (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, §§ 101-1532 (the "Bankruptcy Code").   The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

3.      To enable the Debtors to minimize the adverse effects of the commencements of the Chapter 11 Cases on their ability to deliver critical health care services to the citizens of Randolph County, North Carolina and the surrounding areas, the Debtors have requested various types of relief in their "first day" motions and applications (each, a "First Day Motion" or "Motion").   The First Day Motions seek relief intended to allow the Debtors to perform and meet the obligations necessary to fulfill their duties as debtors in possession in the Chapter 11 Cases and to retain the professionals needed to guide them through the Chapter 11 Cases.   I believe the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to its provision of health care services or loss of productivity or value; (b) constitutes a critical element to achieving a successful reorganization of the Debtors; and (c) serves the interests of the Debtors' estates and creditors.

4.      I submit this Affidavit in support of the First Day Motions and the filing of the Chapter 11 Cases.   Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, or information supplied to me by other members of the Debtors' management and the Debtors' professionals.   I am authorized to submit this Affidavit on behalf of the Debtors, and if called upon to testify, I could and would testify competently as to the facts set forth herein.

## I.    GENERAL BACKGROUND AND OVERVIEW OF BUSINESS OPERATIONS

### A.    Overview of Health Care Services

5.    The Debtors and certain non-debtor affiliates (collectively, the "System") operate as a comprehensive healthcare system based in Asheboro, North Carolina. Randolph operates a 145-bed hospital, an extensive network of primary care and specialty physician offices, outpatient rehabilitation centers, homecare services, advanced imaging, and an accredited cancer treatment center. The System has a medical staff of 373 active and credentialed physicians, representing eleven medical specialties, and its facilities include a nursery, an ICU, operating suites, freestanding diagnostic and treatment facilities and satellite offices, and an outpatient center. The System's diagnostic and treatment capabilities include a medical oncology program through the Randolph Health Cancer Center.

6.    The local community's need for the System's services is critical. In fiscal year 2019, the System had 4,672 admissions into the hospital, 37,705 emergency room visits, 3,063 outpatient surgeries at the Outpatient Surgery Center, and 707 deliveries. As of 2016, Randolph's share of the health care market in Randolph County is approximately 30% for general acute inpatient services, 32% for ambulatory surgical services, and 58% for emergency services.

7.    The System's patient mix consists of individuals covered by Medicare and Medicaid, individuals with third-party insurance coverage, and individuals without insurance coverage. The Debtor's payor mix is proof of the region's need for nonprofit hospital care: for the 2019 fiscal year, Medicare and Medicare Advantage accounted for 51% of the System's gross revenue, Medicaid accounted for 15% of gross revenue, managed care and commercial insurance account for only 22% of gross revenue, and approximately 9% of the System's patients

3

are uninsured (*i.e.*, self-pay or charity care). The System is committed to providing charity care; the amount of direct and indirect costs under the System's charity care policy exceeded $3.3 million in fiscal year ending September 30, 2018.

**B.** **Corporate Structure and Governance**

8. Randolph was incorporated in 1931 under the name Randolph County, Incorporated to provide for a hospital in Randolph County, North Carolina. In 2001, Randolph amended its corporate name to Randolph Hospital, Inc. In 2017, Randolph began doing business as Randolph Health.

9. As mentioned above, Randolph is a nonprofit corporation, and it is exempt from taxation under § 501(c)(3) of the Internal Revenue Code of 1986, as amended. Randolph is governed by a volunteer Board of Trustees. A current roster of the Board of Trustees, along with an organizational chart of certain related entities (discussed below), is attached hereto as **Exhibit A**.

**C.** **Related Entities**

10. Randolph has an interest in the following entities:

a. Randolph Specialty Group Practice: Randolph is the sole member of Randolph Specialty Group Practice ("Randolph Specialty"), a nonprofit corporation formed to employ physicians and advanced care practitioners in the specialties of family medicine, internal medicine, pediatrics, orthopedics, urology, otolaryngology, and gastroenterology. Randolph Specialty also operates five outpatient rehabilitation locations. Randolph Specialty Group Practice is the successor to Randolph Medical Associates and Randolph Specialty Group upon their merger in 2015. Randolph Specialty is a Debtor.

b. Piedmont Integrated Health: Randolph is the sole member of Piedmont Integrated Health, which was formed to create a Clinically Integrated Network. This entity is dormant and is not a debtor.

c. MRI of Asheboro, LLC: Randolph is the sole member of MRI of Asheboro, LLC ("MRI"), which offers MRI services. MRI is a Debtor.

d.  <u>StayWell Senior Care, Inc.</u>: Randolph is the 80% owner of StayWell Senior Care, Inc. ("StayWell"), a nonprofit corporation which operates a non-residential facility that includes an adult day health area, comprehensive medical services on site and additional services, including transportation and medications, pursuant to the PACE model of care. The remaining ownership is held by Hospice of Randolph County (5%) and The Moses H. Cone Memorial Hospital Operating Corporation d/b/a Cone Health ("Cone Health") (15%). StayWell is a non-debtor affiliate.

e.  <u>Randolph Cancer Center, LLC</u>: Randolph owns 60% of Randolph Cancer Center, LLC ("Cancer Center"). Cone Health owns the remaining 40%. Randolph and Cone Health formed the Cancer Center to develop and operate an oncology center in Randolph County. Cancer Center is a non-debtor.

11.     Additionally, Randolph formed the Randolph Hospital Community Health Foundation (the "Foundation") to provide philanthropic support for the System's programs and services, promote and improve access to health care and the health and welfare of the communities within Randolph's service area. The Foundation is a nonprofit corporation and is governed by a Board of Directors which is separate from Randolph's Board. The Foundation is a non-debtor.

**D.    Cone Health**

12.     In 2016, Randolph entered into a Management Services Agreement with Cone Health. Pursuant to the Management Service Agreement, Cone Health manages the System and provides certain executive positions, including chief executive officer and chief financial officer, accounting services, and operational services. Cone Health has a number of other important connections to the Debtors which are discussed further in this affidavit.

**E.    Randolph's Skilled Workforce**

13.     As of the date of the Debtors' most recent payroll cycle, there are 821 full time employees, 69 part-time employees, and 193 PRN employees. Randolph contracts with 10

employed physicians, 16 employed other medical professionals, and 82 active physicians who are not employed.

### E.    Commitment to Highest Quality Care

14.    The Debtors are committed to providing the highest quality care and have policies and oversight procedures in place to ensure the quality of their patient care.    The Debtors' oversight and commitment to quality care include the following:

- <u>Chief Medical Officer</u>: Charles West, MD has served as the Chief Medical Officer ("CMO") of Randolph since 2012 where his primary focus is on quality management and medical staff affairs.  Dr. West is an experienced board-certified physician that has been on the medical staff since 1992 and previously served as Chief of Medical Staff.

- <u>Quality Management Department</u>:  This department oversees CMS Inpatient Quality Reporting (IQR) and Outpatient Quality Reporting (OQR).  They ensure that the members of the medical staff are appropriately credentialed.  They facilitate process improvement activities throughout the organization and develop a Performance Improvement Plan approved by the Board of Directors.

- <u>Patient Care Representative and Complaint Procedures</u>: Randolph has a thorough patient complaint review and resolution process.  Randolph informs patients of the process at the time of registration or admission and how to call to voice a complaint.  In the event of a complaint, the Quality Management Department and the Patient Safety Officer, with the assistance of Department Directors, service on Randolph's grievance committee.  They are supervised by the Director of Patient Safety.  Randolph's Board of Directors has a Quality Committee, which is updated regularly on these matters.

- <u>Culture of Safety</u>:  The hospital promotes a culture of safety by providing a means for all staff members to voice any concerns that they may have related to patient care without fear of retribution.

- <u>Daily Patient Safety Huddle and Multidisciplinary Rounds</u>: A Safety Huddle is held every morning with all areas of the hospital to increase organizational awareness of patient safety issues and to address safety critical issues that are identified.  The medical staff and members of the all clinical areas including nursing, physical therapy, respiratory therapy, case management and pharmacists meet daily to review and discuss each patient and their comprehensive needs for quality care.

- <u>Physician Professional Review Process</u>: Randolph Hospital has a comprehensive medical staff professional practice evaluation plan to monitor and assess the care provided by its medical staff and uses the evaluations and data to improve care.

- <u>Board Quality Committee</u>: The Board of Directors has a Quality Committee that meets regularly on all matters impacting the quality of patient care, including updates on quality improvement initiatives and measures, updates on the performance of each department, CMS reports, staff performance, patient satisfaction, and numerous categories of quality and patient satisfaction data.

- <u>Board of Directors</u>:  A report from the Quality Committee of the Board is a standing agenda item at each board meeting.  The board reviews a Board Quality Experience Dashboard that includes metrics related to safety, quality, satisfaction and value.  The CMO provides reports on various quality related matters.  The Board sets patient quality priorities annually.

### *(1)*　　*State and Federal Regulatory Oversight and Accreditation*

15.     Randolph is accredited by The Joint Commission, an independent, nonprofit organization from the private healthcare sector that surveys and accredits hospitals, laboratories and other healthcare entities based on rigorous standards of safety and quality.   The Joint Commission certified surveyors provide rigorous evaluation of the hospital's patient care processes and expert advice on ways in which the hospital can improve patient care. Accreditation by the Joint Commission means that Randolph has voluntarily undergone a challenging, comprehensive evaluation to review and improve the key factors that can affect the quality of their care and safety of their patients.  Accreditation by The Joint Commission is considered the gold standard in health care and they have been granted deeming authority by the Center for Medicare and Medicaid Services ("CMS") so that a hospital accredited by The Joint Commission is also considered to be compliant with all Conditions of Participation for CMS. The Joint Commission subjects Randolph to unannounced surveys every 24-36 months the Randolph laboratory every 24 months to determine their commitment to and success in implementing the best practices in patient safety and quality.  In the last two years, Randolph has

7

achieved the Joint Commission's top-performer status in the first four quality measures: heart attack, heart failure, pneumonia and surgical care.

16.     The Debtors are in full compliance with the patient care and safety standards established by CMS and the North Carolina Department of Health and Human Services ("DHHS"). The Debtors maintain the appropriate and necessary licenses to operate in the State of North Carolina, which licenses are renewed annually.

17.     The Debtors are also subject to periodic surveys by DHHS—sometimes acting as the agent for other regulatory agencies such as CMS or the Office of the Inspector General ("OIG"). These surveys are usually in response to patient complaints, suspected regulatory noncompliance or to follow-up on those findings. The Debtors have not had a 'for cause' survey since February 2018.

18.     In addition, licensed personnel of the Debtors, including physicians, nurses, therapists, pharmacists, and technicians are regulated by their individual state boards, including the North Carolina Medical Board, North Carolina State Board of Dental Examiners, North Carolina Board of Podiatry Examiners, North Carolina Board of Nursing, and the North Carolina Board of Pharmacy.

19.     Further, Randolph voluntarily participates in surveys and programs of the Leapfrog Group, which is a coalition of large employers and other health care purchasers focused on improving the safety, quality and affordability of health care. As part of Leapfrog Group's Hospital Safety Survey, the Debtors are thoroughly tested and graded along with more than 2,500 general hospitals nationwide on patient care and safety. The Hospital Safety Survey assigns A, B, C, D and F grades to hospitals based entirely on their ability to prevent errors, injuries and infections, shows that hospitals are making incremental improvements. The grades

are calculated under the guidance of the Leapfrog Blue Ribbon Expert Panel and subjected to the peer review in the Journal of Patient Safety.   In its most recent Leapfrog Group Hospital Safety Scores report from 2018, Randolph received an overall grade of "A."

20.     The Debtors also use Press Ganey to gather patient satisfaction data based on the patients' experience.  Press Ganey's survey data allows the Debtors to benchmark their satisfaction scores against their peer groups and to target areas for improvement.

21.     In addition to the patient care oversight provided by The Joint Commission (with deemed authority of CMS), different areas of the hospital are surveyed, accredited and/or certified by diverse regulatory agencies including the DHHS, NC Division of Health Service Regulation, US Food and Drug Administration (Mammography Quality Standards Act, Clinical Laboratory Improvement Amendments), American College of Radiology, College of American Pathologists, Association for Clinical Oncology and the Randolph County Health Department.

22.     Randolph did not experience any unexpected or unannounced surveys in 2019 because of complaints directed to outside agencies.

*(2)     Internal Operating Guidelines and Safeguards*

23.     The Debtors have developed a comprehensive plan for providing patient care services that emphasize quality of life in a safe, caring, cost-effective, and supportive manner which is subject to internal operating guidelines and safeguards as described above.  The Debtor has nurse turnover rate of 13.5%, well below the national average.  They have developed a pain management and opioid stewardship program to reduce inappropriate prescribing patterns by their medical staff and the potential for abuse in the communities that they serve.  A tele-stroke program and 'Code Stroke" clinical protocols have been instituted to reduce disability and death from stroke.  Behavioral health patients are managed through a tele-psychiatry program.

Excellence in patient care is emphasized and demonstrated through standards of nursing practice and care, policies and procedures, and the Debtors' mission, vision, and values.   Indicators for patient outcomes are monitored on an ongoing basis.  Results of the Randolph's monitoring are utilized to identify opportunities for improvement and reported to Randolph's leadership on a regular basis.   Effectiveness of actions taken to improve processes is measured through continued monitoring and reported back to the hospital management.

24.      Quality measures are primarily directed by the CMS and Joint Commission for Hospitals and Laboratories.  Randolph independently sets measurement criteria based on case study and trends in performance and patient outcomes. Patient safety measures are evaluated internally and by CMS and action plans developed based on these findings.

25.      As a testament to the quality of care provided by the Debtors and the sufficiency of its oversight policies and procedures described herein, the Debtors have received the following awards and accreditations:

- Accredited healthcare facility by The Joint Commission
- The Leapfrog Group Safety Grade of "A"
- "No Condition" Survey from The Joint Commission in 2017
- Joint Commission's top-performer status in four quality measures: heart attack, heart failure, pneumonia and surgical care
- Randolph Hospital's laboratory maintains a CLIA certification and CAP accreditation
- Advanced STAR (Stewardship of Antimicrobial Resources) certification by the NC Division of Public Health
- BCBSNC Tier 1 Provider for 5th consecutive year
- A Patient and Family Advisory Council that has received an award for the "Outstanding Patient and Family Advisor" by the North Carolina Hospital Association in partnership with the North Carolina Quality Center
- HealthGrades.com recognition:  Patient Safety Excellence Award™ (2019, 2018, 2017), America's 100 Best Hospitals for Pulmonary Care Award™ (2019, 2018), Stroke Care Excellence Award™ (2019, 2018)
- Positive gain in the CMS Value Based Purchasing Program and no penalty in the CMS Hospital Acquired Condition Program
- Medicare Spending per Beneficiary is within the best 25% in the nation

**F.**     **Pre-petition Debt Structure**

*(1)*     *Term Loan*

26.    On August 31, 2012, Randolph entered into a Term Loan Agreement (as amended, the "Loan Agreement") with Bank of America, N.A. ("BOA") in the original principal amount of $44.9 million.    Additionally, in 2008, Randolph entered into an ISDA Master Agreement as amended and supplemented from time to time (the "Swap Agreement") with BOA. In accordance with the terms of the Swap Agreement, Randolph and BOA entered into a Transaction (the "Transaction") pursuant to the confirmation with a trade date of July 21, 2008, an initial notional amount equal to $22.9 million and a termination date of October 1, 2037. The Swap Agreement constitutes an obligation under the Loan Agreement secured by Obligations No. 3 and No. 4 issued under the Master Indenture. The Transaction was terminated as of June 18, 2019 and in connection with the termination of the Transaction, Randolph currently owes BOA approximately $2.6 million. First Horizon Bank is a minority participant in the term loan.

27.    Randolph's obligations under the Loan Agreement are secured by Obligation No. 4 issued under the Master Trust Indenture dated June 1, 2007 between Randolph and Randolph Specialty (collectively, the "Obligated Parties").[1]    Pursuant to the Master Trust Indenture, the Obligated Parties granted a security interest in certain "Accounts" (as defined therein) and the proceeds thereof to U.S. Bank, National Association, as successor to First-Citizens Bank & Trust Company, as Master Trustee.

---

[1] Prior to October 15, 2019, the Foundation was also obligated under the Term Loan Agreement. The Foundation obtained a release from BOA on that date in exchange for a  cash payment by the Foundation to BOA.

28.     The Term Loan Agreement is further secured by that certain Deed of Trust, Assignment, and Fixture Filing dated April 24, 2014 and recorded on April 28, 2014 in Book 2387, Page 73 of the Randolph County, North Carolina Public Registry, pursuant to which Randolph granted BOA a lien on certain real property described therein.

29.     The term loan under the Term Loan Agreement matured on February 28, 2020. As of the petition date, the aggregate amount due under the Term Loan Agreement and SWAP obligation is approximately $24.0 million.

### (2)     *Other Significant Obligations*

30.     Prior to February 28, 2003, certain entities of the System offered its employees a defined benefit pension plan (the "Defined Benefit Plan"). Effective February 28, 2003, the Defined Benefit Plan was frozen, with no further benefits thereafter accruing under the Defined Benefit Plan for most participants. As of January 2019, the Defined Benefit Plan had 730 total participants, 230 currently receiving benefits, 205 active employee participants who are not yet eligible, and 295 former employee participants who are not yet eligible. Pursuant to the Debtors' most recent actuarial estimate, the Defined Benefit Plan has an estimated funding deficit of $8.1 million. No contributions have been made to the Defined Benefit Plan year-to-date.

31.     The Debtors also finance and lease certain equipment and facilities under capital leases, and operating leases from, among others, Bank of America Leasing and Capital LLC. The amount of principal outstanding under certain capital leases is approximately $810,000. Total rent expense for the fiscal year ending September 30, 2019 was approximately $2.0 million, including intercompany rent payments.

12

32.     The Debtors have approximately $8.5 million of trade debt, which includes amounts owed to Cone Health.

## II.    EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

### A.    Financial Pressures

33.     In recent years, The Debtors have been faced with declining patient volumes, stagnant reimbursement rates and increased operating costs due to significant industry-wide headwinds, including: (i) downward pressure on reimbursement rates due to the transition to Medicare Advantage Plans, among other factors; (ii) contraction of inpatient volumes due to advancing technology and medical practice norms leading to a higher proportion of services being performed in the outpatient setting, reduced length of stay and reduced readmissions, (iii) skilled labor shortages, (iv) increased non-labor operating costs, and (v) patient outmigration and loss of overall market share.  North Carolina healthcare systems have faced additional challenges in the state healthcare environment, including reform to the 340B program, state health plan changes, Medicaid Managed Care, and site neutral payments.

34.     In addition to the substantial healthcare industry-wide pressures, the Debtors have also faced a number of their own, specific challenges which further stressed its finances.  These include: (i) geographic location and proximity to other competitive health systems, (ii) increased competition in the region caused by expansion and system consolidation, (iii) patient population demographics (high percent of unreimbursed care which continues to worsen), (iv) fragmented physician network, (v) age and state of physical plant, and (vi) additional costs and distraction caused by unsuccessful integration efforts.

35.     As a result of these financial pressures, on a consolidated basis, the System incurred a loss from operations of $3.4 million for the fiscal year ending September 30, 2019, $10.1 million for the fiscal year ending September 30, 2018, and $14.5 million for the fiscal year ending September 30, 2017.

**B.     Pre-Petition Marketing and Search for Integration Partner**

36.     In recognition of the fact that the healthcare industry is rapidly changing and that preserving its ability to provide critical, cost-effective healthcare services required integrating with a larger healthcare system, the System began to pursue a full financial integration transaction in 2015.  In September 2015, the System initiated partnership discussions and solicited interest from a number of potential partners.  As a result of this process, and in what was believed at that time to be the first step toward a full integration, Randolph entered into the Management Services Agreement with Cone Health in June 2016.

37.     In January 2017, Randolph engaged Ascendient Healthcare Advisors, Inc. ("Ascendient") as advisors to assist with the affiliation process.

38.     At this time, the System also began pursuing a potential full integration transaction with Cone Health.  In February 2017, the System began having bi-weekly meetings with Cone Health as part of the integration due diligence.  In May 2017, the parties announced entry into a Letter of Intent for the sale of the System to Cone Health.  In May 2018, however, Cone withdrew from the integration negotiations.

39.     When negotiations with Cone began to show clear signs that a transaction may not materialize, Randolph took action to identify other partner candidates and develop solutions for the continuation of high-quality health care in Randolph County.  In May 2018, Randolph and certain of its affiliates engaged Ankura Consulting Group, LLC ("Ankura") as

restructuring advisors, including appointing Louis E. Robichaux, IV as Chief Restructuring Officer. With the assistance of Ascendient, Ankura, and its outside legal counsel, the System again initiated a search for an integration partner. From May to September 2018, the System and its advisors undertook an M&A solicitation process designed for a distressed organization, which included *inter alia*: (i) aggressively soliciting interest from an array of feasible candidates, (ii) meeting with a number of health systems, (iii) drafting and distributing a detailed confidential information memorandum, (iv) making presentations to several potential partners, and (v) providing guidance to interested parties regarding submission of expressions of interest. Despite this process being well-designed and diligently carried out, these efforts were ultimately unsuccessful in securing an integration partner.

40.    Throughout this time, the System implemented a substantial cost savings and margin improvement plan, resulting in millions of dollars in annual margin improvement. Randolph and its advisors also considered and analyzed various paths forward, including a stand-alone reorganization plan, bankruptcy sale, transition of stewardship of care, and closure. Randolph's advisors re-canvased all potentially interested parties it previously solicited and discussed various transaction models not initially offered.

### C.    Development of Successor Plan and The Rural Health Care Stabilization Program

41.    As a result of these efforts and the lack of interest in a traditional sale of substantially all of its assets, the System and other stakeholders determined that its best path to meeting the critical healthcare needs of the System's service area, while also preserving value for its creditors, is to identify a successor health care organization ("Successor") to become responsible for serving the System's market area <u>without</u> being saddled with any of the Debtors'

obligations and aged, obsolete facilities. The envisioned concept is for the Successor to build and operate modern, right-sized replacement facilities and implement a progressive "model of care," while securing state and local funding to effectuate a sale of the Debtors' assets to an newly formed nonprofit interim operator (referred to as "Randolph 2.0") and fund the interim operating needs during the build period for the new facility. The desired result of this "Successor Plan" is to allow for the sale of the Debtors' assets in bankruptcy for the benefit of its creditors, while also funding a transition from the current, financially unsustainable healthcare model to one where population health management and modern, right-sized services and facilities provide access to high quality care for decades to come.

42.    As a critical first step, and as a result of Randolph's intensive efforts, in 2019 the North Carolina General Assembly enacted legislation creating the Rural Health Care Stabilization Program ("Stabilization Program").[2] The Stabilization Program authorizes the State to provide loans at below-market interest rates for the benefit of distressed hospitals in rural communities in order for the hospital to transition to more sustainable, efficient and proportionally-sized health care service models.

43.    As the Stabilization Program was in the process of being drafted and ultimately enacted, Randolph was working closely with Randolph County (the "County") to develop its Successor Plan, with the County serving as the party to apply for the loan under the Stabilization Plan and accept responsibility for loan repayment.

44.    At the outset of developing the Successor model concept, Randolph met with a small number of capable healthcare systems in search of an organization to serve as Successor. Ultimately, it entered into negotiations with Cone Health to serve as the Successor.

---

[2] N.C. Gen. Stat. 131A-30 *et seq*.

16

These negotiations have resulted in significant progress between the parties but remain ongoing as of the Petition Date.

45.     On January 23, 2020, the County and Randolph jointly submitted an application for funding under the Stabilization Program which references the Successor Plan as its centerpiece.  As of the Petition Date, the application remains pending with the administrator of the Program, UNC Health Care, who will make a recommendation to North Carolina's Local Government Commission ("LGC") on whether the requested loan should be approved.

46.     Although Randolph has made significant progress with these key first steps, there are number of critical steps that remain to be accomplished, including:

a.   Obtaining LGC's approval of the loan to the County;

b.   Completing negotiations with Cone Health and the County on the terms of the Successor Plan;

c.   Obtaining approval for the Successor Plan from Cone Health's Board of Directors;

d.   Obtaining County approval for the Successor Plan by vote of the County Commissioners;

e.   Negotiating the terms of the asset sales with secured creditors;

f.   Negotiating definitive agreements;

g.   Securing management commitments to operate Randolph 2.0;

h.   Obtaining required financing for Randolph 2.0; and,

i.   Obtaining Bankruptcy Court approval for the Debtors' participation in these transactions, which the Debtors expect will be embodied in a Joint Plan of Liquidation.

**D.     Parallel Marketing Efforts**

47.     Randolph believes that the Successor Plan represents the *best possible outcome* for all stakeholders, particularly Randolph County residents who rely on the System for its healthcare needs.  Randolph is committed to negotiating the Successor Plan, but given the remaining steps to be accomplished and the critical need to close an alternative transaction in the event the Successor Plan cannot be closed, Randolph has engaged Houlihan Lokey Capital, Inc. to widely market Randolph to other potentially interested parties.  Randolph intends to run these sale efforts concurrently with its continued negotiation of the Successor Plan.

## III.     SUMMARY OF FIRST DAY MOTIONS

48.     To enable the Debtors to operate effectively and minimize the adverse effects of the commencement of the Chapter 11 Cases on their ability to provide high quality patient care in the Randolph County community, the Debtors have requested various relief in their First Day Motions.  The First Day Motions seek authority to, among other things, obtain use of cash collateral, maintain employee morale, and ensure the continuation of the Debtors' cash management and business operations without interruption.

49.     In connection with preparing for the Chapter 11 Cases, I have reviewed the First Day Motions referenced below.  The First Day Motions were prepared with my input and assistance, or with the input and assistance of employees working under my supervision.  I believe the information contained in the First Day Motions is accurate and correct.  As set forth in more detail below, I believe that entry of orders granting the relief requested in the First Day Motions is critical to the Debtors' ability to preserve the value of their estates, succeed in their reorganization efforts, and continue to provide quality care to their patients.

A.    **Administrative Motions**

(1)    ***Debtors' Motion for Order Directing Joint Administration of Their Related Chapter 11 Cases***

50.    The Debtors in the Chapter 11 Cases are "affiliates" as that term is defined in § 102(2) of the Bankruptcy Code in that both Randolph Specialty and MRI are wholly owned subsidiaries of Randolph and substantially all of their property is operated under an agreement with Randolph.    Randolph Specialty and MRI participate with Randolph in an integrated health delivery system.    Therefore, the Debtors request that their Chapter 11 Cases be jointly administered for procedural purposes.    I believe the joint administration of the Chapter 11 Cases will avoid the unnecessary time and expense of duplicative motions, applications, orders, other pleadings, and related notices that would otherwise need to be filed in each separate case absent joint administration.    Moreover, joint administration will relieve the Court of the burden of entering duplicative orders and maintaining duplicative files, and will ease the burden of the Office of the Bankruptcy Administrator in supervising these cases.    Accordingly, joint administration of the Chapter 11 Cases will save considerable time and expenses for the Debtors, the Clerk of Court, the Bankruptcy Administrator, and other parties in interest.

(2)    ***Debtors' Motion for Order Establishing Certain Notice, Case Management, and Administrative Procedures***

51.    By this Motion, the Debtors request the Court to enter an order providing for certain notice, hearing, and other case management procedures in the Chapter 11 Cases. Given the numbers of parties in interest in the Chapter 11 Cases, requiring that service be made upon each of these parties would be a huge expenditure of the Debtors' limited resources.    Thus, I believe requiring paper service of certain pleadings on the main parties in interest, as well as authorizing service on all parties by email, will be efficient and save the Debtors' estates

19

significant time and expense. Additionally, due to the volume of motions and other filings that will be filed in the Chapter 11 Cases, the Debtors have proposed that specialized hearing procedures be created, including the creation of regularly scheduled omnibus hearings at which the Court, the Debtors, and parties in interest can address several motions at once, thereby avoiding substantial time and expense of scheduling separate hearings on each discrete matter.

### (3)   *Debtors' Motion for Additional Time Within Which to File Schedules and Statements of Financial Affairs*

52.    The Debtors have requested that the Court extend by an additional thirty days, for a total of 44, the date by which the schedules and statements of financial affairs (collectively, "Schedules and Statements") must be filed, pursuant to Bankruptcy Rule 1007. The Debtors have tens of thousands of potential creditors (including former patients). Further, the conduct of the Debtors' business operations requires the Debtors to maintain voluminous books and records and complex accounting systems. Given the size and complexity of the Debtors' operations, the number of creditors, and the fact that certain prepetition invoices have not yet been received or entered into the Debtors' accounting systems, the Debtors have begun but not yet finished compiling all of the information required to complete the Schedules and Statements.

53.    Moreover, due to the complex nature of the Debtors' business operations and the time required of staff in connection with numerous other matters incident to the commencement of the Chapter 11 Cases in the few weeks following the Petition Date, I believe the fourteen day automatic extension of time to file the Schedules and Statements will not be sufficient to allow the Debtors to complete the Schedules and Statements. Therefore, I believe the substantial size, scope, and complexity of the Chapter 11 Cases and the volume of documents

and information that must be compiled and reviewed by the Debtors' staff to complete the Schedules and Statements justifies the requested extension.

### (4) *Debtors' Motion for Order Approving Consolidation of Creditor Matrices*

54.      By this Motion, the Debtors seek permission to (i) maintain a consolidated list of creditors in electronic format in lieu of filing a creditor matrix; (ii) file a consolidated list of the twenty largest unsecured creditors; and (iii) mail initial notices to creditors.  As stated, the Debtors have many potential creditors and complex operations.   Converting the Debtors' computerized information to a format compatible with the matrix requirements would be a burdensome task and would increase the risk of error with respect to information that exists already in the Debtors' computer systems.  Moreover, I understand that the Debtors have filed an application seeking the appointment of Epiq Corporate Restructuring, LLC ("Epiq") as claims, noticing, and balloting agent in the Chapter 11 Cases.  If such application is granted, Epiq will assist with consolidating the Debtors' compute records into a creditor database and complete the mailing of notices to the parties in the database.  Accordingly, I believe it is in the best interests of the Debtors' estates to avoid the cost and risk of error associated with preparing and filing separate matrices.

55.      In addition, I believe filing and filing separate lists of the twenty largest unsecured creditors in each of the Debtors' cases would be an unnecessary task, consuming an unnecessary amount of the Debtors' resources, as I do not believe it would facilitate the review of the Chapter 11 Cases by the Bankruptcy Administrator or any other party in interest.

### (5) *Debtors' Motion for Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Official Committee Members*

56.      The Debtors propose that the monthly payment of compensation and expense reimbursement of separately retained chapter 11 professionals be structured pursuant to certain procedures which will enable the Debtors to closely monitor the costs of administration, maintain a level cash flow availability, and implement efficient cash management procedures. Moreover, these procedures will allow the Court and parties in interest to ensure the reasonableness of the compensation and reimbursement sought pursuant to such procedures. The Debtors submit that the efficient administration of the Chapter 11 Cases will be significantly aided by the interim compensation and expense reimbursement procedures.

### (6)    *Debtors' Motion for an Order Authorizing and Establishing Procedures to Maintain and Protect Confidential Patient Information*

57.      The Debtors are "covered entities" under the Health Insurance Portability and Accountability Act of 1996 ("HIPPA") as they are health care providers who transmit health information in electronic form.  HIPPA prohibits the Debtors from disclosing "individually identifiable health information" which includes any information relating to the individual's "past, present or future physical or mental health or condition of an individual, the provision of health care to the individual, or the past, present or future payment for the provision of health care to the individual" that also "identifies the individual or with respect to which there is a reasonable basis to believe that the information can be used to identify the individual."

58.      The Debtors seek to implement certain procedures necessary to maintain the confidentiality of "protected health information" of the Debtors' current and former patients defined in and required by HIPPA while also complying with the requirements of the Bankruptcy Code.

59.      These procedures are as follows:

a. The Debtors shall omit any reference to current or former patients from the matrix of creditors filed in these cases.

b. The Debtors shall list any current or former patients on their Schedules and Statements of Financial Affairs solely by a number, such as "Patient 1." Upon request, an unredacted copy of the Schedules and Statements of Financial Affairs shall be available to (i) the Court; and (ii) the Bankruptcy Administrator. To the extent any other party-in-interest requests an unredacted copy of the Schedules or Statements of Financial Affairs, it must first obtain an order from this Court authorizing the Debtors to provide such unredacted copies after notice and a hearing.

c. The Debtors and/or their proposed claims and noticing agent shall maintain a list of all current and former patients who appear on the matrix of creditors in these cases (the "Patient List"). To the extent that any documents are served upon any person on the Patient List, the Debtors shall note in the respective certificate of service that the parties served include persons listed on the Patient List. To the extent any other party-in-interest requests the Patient List, it must first obtain an order from this Court (after notice and a hearing) directing the Debtors to provide the Patient List to such party.

d. To the extent that any person on the Patient List discloses his or her own health information in any pleading, proof of claim, notice or other publicly available document, the Debtors and their professionals shall, and to the extent required by the Bankruptcy Code, the Bankruptcy Rules, or any

other applicable law, rule, or court order, be authorized to include protected health information about the patient in any subsequent pleading, notice, document, list, or other public disclosure made in connection with these Chapter 11 Cases, and such disclosure shall not be deemed an "impermissible disclosure" within the meaning of HIPPA or any other law or regulation.

60.     I believe that the requirements of the Bankruptcy Code conflict with those of HIPPA particularly as it relates to the requirement in § 521 of the Bankruptcy Code that the Debtors list all of their creditors and file schedules of all assets and liabilities as doing so would likely require the disclosure of "individually identifiable health information" prohibited by HIPAA.

61.     I believe that the proposed procedures balance the need to maintain confidentiality under HIPAA with the disclosure requirements set forth in the Bankruptcy Code. Further, I believe that it is essential that the Debtors continue to preserve the trust of their patients by taking necessary steps to preserve sensitive information such as "individually identifiable health information."

### B. Motions to Use Cash Collateral and Pay Employees and Other Critical Obligations

#### *(1)*   *Motion of the Debtors to Use Cash Collateral, Grant Adequate Protection in Respect Thereof, and Schedule a Final Hearing*

62.     As set forth above, BOA through the Master Trustee of the Master Trust Indenture, has a security interest in "Accounts" as defined in the Master Trust Indenture; however, it does not have a perfected security interest in Randolph's deposit accounts.

Nonetheless, out of an abundance of caution and without waiving any right to contest BOA's alleged interest, pursuant to the Motion to Use Cash Collateral, the Debtors request authorization to use existing cash and the proceeds of receivables which are the alleged cash collateral ("Cash Collateral") of the Master Trustee/BOA.

63.     The proposed use of Cash Collateral will be the Debtors' primary source of liquidity to fund operations and necessary working capital expenditures during the Chapter 11 Cases.  The requested relief would also enable the Debtors to continue to operate as a going concern and to preserve and maximize the value of their assets for the benefit of all creditors and other stakeholders.  Moreover, the proposed use of Cash Collateral is critical to the Debtors' ability to continue providing high quality medical care during the pendency of the Chapter 11 Cases.  Specifically, use of Cash Collateral would enable the Debtors to purchase inventory, goods and services necessary to meet the needs of its patients and pay its employees and ordinary course operational expenses, all of which are necessary to continue the high quality healthcare care services that the Randolph County community expects from the Debtors.     Without the requested relief, the Debtors' continued ability to operate as a going concern would be jeopardized, as more particularly set forth in the Motion to Use Cash Collateral.

64.     The Debtors are without adequate funds, absent access to the alleged Cash Collateral, with which to operate.  The Debtors thus request emergency, interim authorization to use Cash Collateral.  The Debtors require the interim use of Cash Collateral to pay for any and all payments on account of prepetition obligations authorized by this Court, such as payroll and taxes, to meet post-petition payroll obligations and salaries and to pay operating expenses, general and administrative expenses, post-petition insurance and taxes, and other essential costs

and expenses.  In my opinion, the Debtors' failure to timely pay such items would result in immediate and irreparable harm to their estates.

65.    Again without waiver of their right to contest the alleged security interest in Cash Collateral, the Debtors propose to provide the Master Trustee/BOA adequate protection as follows: to the extent of any diminution in value, BOA will receive (i) replacement liens on post-petition receivables and unencumbered cash to the same extent and validity as such liens existed prepetition as set forth in the proposed Interim Order and (ii) an adequate protection payment.  In addition, the Debtors' use of Cash Collateral will be pursuant to the proposed interim budget, which is attached to the Motion, and other accounting and reporting requirements as set forth in the Motion.

      (2)     ***Debtors' Motion for an Order Authorizing the Debtors to Pay Certain Prepetition Wages, Salaries and Other Compensation to Employees, Maintain Employee Benefits Programs, and Related Relief***

66.    As summarized above, the Debtors have 821 full time employees, 69 part-time employees, and 193 PRN employees.  Randolph contracts with 10 employed physicians, 16 employed other medical professionals, and 82 active physicians who are not employed. Approximately 13% of the workforce is salaried and 87% is hourly.  All of the Debtors' employees are paid bi-weekly.  The Debtors do not have any employees who are members of any union.

67.    In addition, in the ordinary course of business the Debtors provide employees with a number of employee benefits which are customary for a hospital of its size, including healthcare, dental and vision plans, worker's compensation benefits, vacation time and other paid leaves of absence, retirement savings plans, flexible benefits plans, life insurance, accidental death and dismemberment insurance, and short- and long-term disability insurance,

tuition assistance, group accident, critical insurance, flexible benefits, and other related benefits. In addition, employees are reimbursed for reasonable and necessary expenses incurred during each pay period, and one of the Debtors' employees has a corporate credit card.[3] $920,000 in total was outstanding for Medical Benefits Obligations (as defined in the above Motion) and $16,000 in other insurance benefit obligations as of the Petition Date

68.    In addition, the Debtors' employees participate in an Internal Revenue Code Section 403(b) retirement plan (the "Section 403(b) Plan"), which is funded by both the participating Employees and the Debtors.  The Debtors' contributions are based on Employee contribution levels, years of service, and hours worked.  The Debtors estimate that approximately $13,000 is outstanding for the Debtors' contributions to the Section 403(b) Plan for the portion of the current pay period which immediately preceded the Petition.[4]  The benefits described in this Paragraph and the preceding Paragraph are collectively referred to herein as the "Benefits".

69.    The Debtors' reorganization efforts require the continued and uninterrupted service of their employees to support continuing operations and to maintain the consistent high-quality services necessary for the Debtors' patients.  Any delay or disruption in the payment of compensation or provision of benefits would impair employee confidence in the Debtors and impair workforce morale at this critical time.  Although the Debtors have employed a strong and clear communications strategy, the commencement of the Chapter 11 Cases will likely cause some level of uncertainty and concern among the Debtors' employees.  The employees' valuable

---

[3] The Debtors previously had other employees who held cards prepetititon, but discontinued that practice approximately three weeks before the Petition Date.
[4]  Due to certain calculation errors relating to the amounts of the Debtors' contribution to the Section 403(b) Plan, a number of employees received less of the employer contribution than they should have, while a smaller number of employees received more employer contribution than they should have. Randolph will list these claims and calculations of amounts due in its Schedules.  The Debtors are not seeking authority to pay these claims in the wages motion.

skills sets, institutional knowledge, and understanding of the Debtors' operations and patients make them essential to the success of the Chapter 11 Cases. The Debtors cannot risk the substantial disruption of its operations and provision of health care services to patients and the immediate harm that would result from the Debtors' failure to make employee wage, compensation, and benefit payments in the ordinary course of business.

70.    Accordingly, the Debtors are seeking authority to pay: (a) certain prepetition wages, salaries, overtime pay, supplemental pay, reimbursable expenses, and other compensation for their employees and independent medical contractors that have accrued, but remains unpaid as of the Petition Date; (b) pre-petition contributions to, and benefits under, the Benefits; (c) pre-petition payroll deductions and withholding; and (d) all costs and expenses incident to the foregoing payments and contributions. Further, prior to the Petition Date and in the ordinary course of business, the Debtors completed payroll obligations and issued checks to their employees. The Debtors understand that certain checks issued to employees and independent medical contractors pursuant to previous payrolls remain outstanding as of the Petition Date due to the timing of the filing of the Chapter 11 Cases. As a result, the Debtors also request authority for applicable banks and financial institutions to honor such checks or electronic transfers on a postpetition basis or to authorize the Debtors to issue new checks or electronic transfers on a postpetition basis in the event such obligations were not honored prior to the Petition Date.

71.    As of the Petition Date, the Debtors estimate that employees and independent medical contractors are owed an aggregate of approximately $575,000 for wages, salary and other compensation and $920,000 for Benefits. The amount of wages, salaries, and

other compensation owed to any particular employee will not exceed the sum of $13,650 allowable as a priority claim under the applicable sections of the Bankruptcy Code.

### (3) Debtors' Motion for an Order Authorizing the Debtors to Remit and Pay Certain Taxes and Fees

72.     The Debtors: (a) collect state and local sales taxes from their customers for ultimate remittance to taxing authorities (the "Sales Taxes"); (b) pay state and local use taxes for the purchases of various materials and supplies necessary for the operation of their business on a day-to-day basis from out-of-state vendors which do not charge the Debtors Sales Taxes in connection with such purchases (the "Use Taxes," together with Sales Taxes, the "Taxes"); (c) charge fees and other similar charges and assessments (collectively, the "Fees") on behalf of various federal, state, and local taxing, licensing and other governmental authorities (collectively, the "Authorities"); and (e) pay Fees to such Authorities for licenses and permits required to conduct the Debtors' business in the ordinary course.  There may be lag time between the time the Debtors incur the obligation to pay taxes and the date payment of such taxes are due. Therefore, various Authorities may have claims against the Debtors for taxes that are accrued and owing but unpaid as of the Petition Date.

73.     By this Motion the Debtors are requesting the authority, but not the direction, to pay prepetition claims of the Taxing Authorities for Trust Fund Taxes or the Sales and Use Taxes. The Debtors estimate that the aggregate prepetition amount for accrued but unpaid Trust Fund Taxes and Sales Taxes, as of the Petition Date, is approximately $36,000.  If the Debtors fail to pay the Trust Fund Taxes or the Sales and Use Taxes, there could be a material adverse impact on the Debtors, including additional interest and penalty charges and the possibility of an audit by the Taxing Authorities.

74.     In addition, in the ordinary course of business, the Debtors are regulated by the Authorities.  Each year, the Debtors are required to pay (a) annual fees to the Authorities in order to remain in good standing to operate their facilities and (b) license fees to the Authorities for the licensing of their facilities and other operations.  The Fees include, among other things, accreditation fees, controlled substance licenses, environmental permits, waste collection and disposal fees, fire safety certificates, pharmacy licenses, and narcotic licenses.

75.     If the Debtors fail to pay the Trust Fund Taxes, the Sales and Use Taxes, or the Fees there could be a material adverse impact on the Debtors, including additional interest and penalty charges and the possibility of an audit by the Authorities.  Accordingly, I believe the requested relief is necessary to prevent immediate and irreparable harm to the Debtors.

C.     **Other Motions Relating to Business Operations**

(1)     *Debtors' Motion for Determination that Appointment of Patient Care Ombudsman is Unnecessary*

76.     By this Motion, the Debtors requests a determination from the Court that the appointment of a Patient Care Ombudsman pursuant to Bankruptcy Code § 333(a)(1) is unnecessary.  As detailed above, the Debtors are subject to stringent state and federal oversight and regulation.  In addition, Randolph is accredited by the Joint Commission for Hospitals and Laboratories and is subject to other third-party monitoring programs such as the Leapfrog Group.  Further, the Debtors have robust internal operating guidelines and safeguards to ensure the quality of patient care.  The Debtors have detailed procedures for handling and resolving patient complaints and patients are informed of their rights upon admission to the hospital.

77.     Based on the Debtors' internal controls and procedures, the experience of its Chief Medical Officer and the other employees responsible for monitoring and ensuring the

quality of patient care, the state and federal regulatory oversight, and the other third party monitoring and oversight to which the Debtors are subjected, I believe the appointment of a Patient Care Ombudsman would be duplicative and would unnecessarily impose substantial additional administrative expense which could delay or impair the ultimate distribution to unsecured creditors. The Debtors' Chapter 11 Cases were caused by financial strain, not any allegations relating to the quality of patient care. There is no evidence of any action taken by state or federal regulatory authorities against the Debtors due to patient care issues. Further, based on the Debtors' procedures and safeguards, its current quality of care statistics, the quality and condition of its current facilities and equipment, and its liquidity, I believe there is no risk of a drastic reduction in the level of patient care during the Chapter 11 Cases. Accordingly, the Debtors request entry of an Order finding that the appointment of a Patient Care Ombudsman is unnecessary in the Chapter 11 Cases.

### (2)   *Debtors' Motion to Approve Procedures for Providing Adequate Assurance to Requesting Utilities*

78.      In the ordinary course of their businesses, the Debtors obtains water, natural gas, electricity, telephone and similar utility products and services (collectively, the "Utility Services") from approximately 21 utility companies (collectively, the "Utility Companies"). The Debtors are seeking an order from the Court prohibiting the Utility Companies from altering or discontinuing services and establishing procedures to provide the Utility Companies with adequate assurance of future performance.

79.      I believe the uninterrupted Utility Services are essential to the Debtors' ongoing operations and the success of the Chapter 11 Cases. Should any utility refuse to provide service, even for a brief period of time, the Debtors' operations could be severely disrupted and

such disruption could impact the Debtors' ability to provide patient care and jeopardize the Debtors' reorganization efforts. Thus, I believe it is essential that the Utility Services continue uninterrupted during the Chapter 11 Cases.

80.    Based upon cash flow from operations, the Debtors expect to have ample liquidity to timely pay all postpetition obligations owed to the Utility Companies. Nevertheless, the Debtors propose to provide a deposit equal to two weeks of Utility Service, calculated as a historical average over the past twelve months, to any Utility Company that request such a deposit (the "Adequate Assurance Deposit"). I believe the Adequate Assurance Deposit would constitute sufficient adequate assurance to any Utility Company. However, in light of the severe consequences to the Debtors, and most importantly their patients, upon any interruption of services by the Utility Companies, and recognizing the Utility Companies have the right to evaluate the proposed adequate assurance, if any Utility Company believes additional assurance is needed, then the Debtors have proposed procedures for the Utility Companies to request such additional adequate assurance.

81.    Accordingly, the Debtors have requested the entry of interim and final orders (a) determining that the Utility Companies have been provided with adequate assurance of payment; (b) approving the Debtors' proposed procedures for Utility Companies to request additional or different adequate assurance; (c) prohibiting the Utility Companies from altering, refusing, or discontinuing services on account of prepetition amounts outstanding or any perceived inadequacy of the Debtors' proposed Adequate Assurance Deposit; (d) providing procedures for the Utility Companies to object to the Debtors' proposed adequate assurance procedures; and (e) determining the Debtors are not required to provide additional adequate assurance beyond what is requested in the Motion.

32

       **(3)**      *Debtors' Motion for Order Authorizing the Debtors to (A) Continue Existing Cash Management System; (B) Maintain Existing Bank Accounts; and (C) Maintain Existing Investment Practices.*

      82.      Prior to the Petition Date, the Debtors maintained a centralized cash management system (the "Cash Management System"), comprised of 22 domestic bank accounts ("Bank Accounts") at financially stable FDIC-insured banks, that facilitates the timely and efficient collection, concentration, management, and disbursement of funds used by the Debtors. The Debtors Cash Management System is similar to those commonly employed by other enterprises comparable to the Debtors. The Debtors routinely deposit, withdraw, and otherwise transfer money to, from and between the Bank Accounts by various methods (collectively, the "Ordinary Transfer Methods"), including by checks, drafts, automated clearing house transfers and other electronic funds transfers. On the aggregate, the Debtors' business generates thousands of transfers. The amount of funds that flow through the Cash Management System fluctuates, but the monthly average for the twelve months ending in September 2019 averaged in excess of $10.8 million in receipts and $11.2 million in disbursements. I believe the use of the Cash Management System is essential to enabling the Debtors to control and monitor funds, ensure cash availability and liquidity, comply with the requirements of their financing arrangements, and reduce administrative expenses by facilitating the movement of funds and providing accurate account balance information.

      83.      In addition, in the ordinary course of business, the Debtors engage in various transactions between themselves and other non-Debtor affiliates (the "Intercompany Transactions"). The Intercompany Transactions are comprised of payroll, rent expense, reimbursement of back-office overhead, and certain operating cash shortfalls amongst the Debtors. The Intercompany Transactions generally occur as follows:

- Randolph Hospital funds Randolph Specialty to cover payroll and other expenditures as a result of Randolph Specialty's continued operating losses.

- Randolph Specialty pays Randolph for rent.

- Randolph MRI funds Randolph Health's operating account on a periodic basis (Randolph MRI's operating expenses are paid out of Randolph Health's operating account).

- Randolph Health is reimbursed by non-debtor Staywell for services rendered.

- Non-Debtor Randolph Hospital Community Health Foundation funds RH, RSG SSC for various grants.

- Randolph Health collects patient receipts (facility fee only) and pays operating expenses on behalf of non-Debtor Randolph Cancer Center, LLC ("Cancer Center"). In addition, Randolph Health leases a facility to the Cancer Center. As part of Randolph Health's disbursements for operating expenses, it reimburses the other member, Cone Health, for certain expenses related to professional services.

84.     Pursuant to the Debtors' Cash Management System, all Intercompany Transactions are tracked such that all debits and credits between the Debtors and affiliates are monitored and recorded. The Debtors maintain intercompany balances for each of the Debtors, which are adjusted as a result of Intercompany Transactions. Consistent with their prepetition practice, the Debtors maintain records of all transfers and can ascertain, trace, and account for all Intercompany Transactions. I believe that the failure to continue the Intercompany Transactions in the ordinary course of the Debtors' business would unnecessarily and severely hinder operations, since certain Debtor and non-Debtor affiliates do not have sufficient infrastructure to manage receipts and disbursements or sufficient receipts to fund the cost of its obligations. The

affiliated Debtors rely on Randolph to collect certain of their receipts and to fund certain payments on their behalf. Accordingly, without continuation of the Intercompany Transactions, the Debtors' ability to operate their businesses during the Chapter 11 Cases would be jeopardized.

85.     Additionally, I do not believe any party in interest will be prejudiced by the Debtors' continuation of their existing Cash Management System. The Debtors will maintain records of all pre- and postpetition transactions within the Cash Management System so that all transfers and transactions will be documented in its books and records to the same extent such information was maintained prior to the Petition Date.

86.     Further, I believe requiring the Debtors to alter their banking and business practices, including the use of numerous business forms (including without limitation checks, letterhead, purchase orders, invoices, envelopes, promotional materials, and other business forms and correspondence) would impair the Debtors' estates and disrupt their efforts to reorganize.

87.     The Debtors also maintain certain prudent investment practices with regard to their Cash Management System (the "Investment Practices) with a primary goal of protecting principal and a secondary goal of maximizing yield while preserving liquidity. The Debtors' designate the investment of funds and annually requests an audit of the hospital's finances by an independent public accountant. Randolph's invested funds are currently invested in money market and certificates of deposits and, as of February 28, 2020, these funds totaled approximately $7.9 million, excluding pension and Rabbi Trust funds. I therefore believe the Debtors' Investment Practices provide sufficient protection for the Debtors' cash assets, and it would be in the best interests of the Debtors estates and creditors for the Debtors to continue to follow them.

88.        Consequently, I believe the maintenance of the Debtors' Cash Management System, business forms, and other banking and Investment Practices during the duration of the Chapter 11 Cases is in the best interests of the Debtors' estates and their creditors and other parties in interest.

### D.    Professional Retention Matters

**(1)    *Debtors' Application to Employ and Retain Nelson Mullins Riley & Scarborough, L.L.P. as Bankruptcy Counsel and General Corporate Counsel for the Debtors and Debtors in Possession***

89.        The Debtors seek to employ Nelson Mullins Riley & Scarborough, L.L.P. ("Nelson Mullins") as bankruptcy counsel and general corporate counsel because Nelson Mullins has extensive experience and knowledge and an excellent reputation providing high quality legal services in the field of debtors' protections, creditors' rights, business reorganizations and complex litigation under chapter 11 of the Bankruptcy Code and in the fields of general corporate, employment, and health care, among others.  Nelson Mullins has represented the Debtors since 2016.  Moreover, Nelson Mullins' partner Robert L. Wilson, Jr. has represented the Debtor for approximately 25 years.  Nelson Mullins has served as general corporate counsel and in that role has represented the Debtors on a variety of matters, including without limitation corporate governance, compliance, litigation, and employment matters, and have gained extensive knowledge of the Debtors' operations.  In addition, in preparing for the Chapter 11 Cases, Nelson Mullins has become familiar with the Debtors' business and the legal issues that may arise in these cases.  Therefore, Nelson Mullins is well qualified and uniquely able to represent the Debtors in the Chapter 11 Cases.

**(2)    *Debtors' Application to Employ and Retain Hendren, Redwine & Malone, PLLC as Conflicts Counsel for the Debtors and Debtors in Possession***

90.     The Debtors seek to employ Hendren, Redwine & Malone, PLLC ("Hendren, Redwine") as co-counsel because Hendren, Redwine has extensive experience and knowledge and an excellent reputation providing high quality legal services in the field of debtors' protections and complex litigation under chapter 11 of the Bankruptcy Code.   In addition, in preparing for the Chapter 11 Cases, Hendren, Redwine has become familiar with the Debtors' business and the legal issues that may arise in these cases.   Therefore, Hendren, Redwine is well qualified and uniquely able to represent the Debtors in the Chapter 11 Cases. Further, Nelson Mullins may have conflicts of interest which prevent it from acting on behalf of the Debtors in connection with any actions or matters adverse to certain of its clients, and as such, Hendren, Redwine will render general legal services to the Debtors as needed throughout the course of these Chapter 11 cases with respect to issues as to which Nelson Mullins has a conflict of interest.

> *(3)*     ***Debtors' Application to Employ and Retain Ankura Consulting Group, LLC to Provide Restructuring Services and to Designate Louis E. Robichaux, IV as Chief Restructuring Officer***

91.     The Debtors seek to retain Ankura to provide them with restructuring services and to designate Louis E. Robichaux, IV as Chief Restructuring Officer.   I believe Ankura has extensive experience in providing restructuring advisory services and has an excellent reputation for services it has rendered in complex health care chapter 11 cases on behalf of debtors and creditors throughout the United States.   Ankura has provided interim management and advisory services in financial distress and have provided such services in a number of health care and non-health care bankruptcy restructurings.   Therefore, I believe Ankura is highly qualified to provide restructuring services.

37

92.    In addition, I believe I am well qualified to act as CRO of the Debtors. I have worked as a restructuring consultant and interim manager in the healthcare industry for 20 plus years. I have extensive experience in cash management and cost reduction, negotiations with various constituencies, financial and operational analysis, and debt restructuring and have particular experience in representing both debtors and creditors in restructurings involving entities in the health care industry. During my years as a restructuring professional, I have acted in an interim management role in a number of significant and complex bankruptcy reorganizations.

### (4)    *Debtors' Application to Houlihan Lokey Capital, Inc. as Investment Bankers*

93.    The Debtors seek to retain Houlihan Lokey Capital, Inc. ("Houlihan Lokey") as investment bankers. Houlihan Lokey is a full-service investment firm and has substantial experience with healthcare restructuring, mergers and acquisitions. The Debtors engaged Houlihan Lokey on February 19, 2020 and it has begun developing a strategy and marketing materials for the Debtors. I believe Houlihan Lokey is highly qualified to provide investment banking services.

### (5)    *Debtors' Application to Employ Epiq as Claims, Noticing, and Balloting Agent*

94.    The Debtors seek to retain Epiq Corporate Restructuring, LLC as their notice, claims, and balloting agent because, among other things, Epiq has extensive experience and an excellent reputation in providing high quality and cost effective services as the notice, claims, and balloting agent in bankruptcy proceedings. Further, the Debtors' creditors and parties in interest include patients with certain information protected by HIPAA, and I believe

Epiq is prepared and equipped to administer such protected information in connection with claims and noticing in the Chapter 11 Cases.

> **(6)**    ***Debtors' Application to Employ Jarrard Phillips Cate & Hancock, Inc. as Communications Consultants***

95.    The Debtors seek to retain Jarrard Phillips Cate & Hancock, Inc. ("Jarrard") as communications consultants. Jarrard is a full service firm offering strategic communications counsel to the healthcare industry and is well-qualified to serve as the Debtors' communications consultants. Jarrard's professionals have assisted and advised, and provided strategic communications advice to previous debtors in chapter 11 cases of similar size and complexity to the Debtors' cases.

> **(7)**    ***Debtors' Motion for an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business***

96.    Due to the number of legal professionals (each an "OCP" and collectively, the "OCPs") that are regularly retained by the Debtors as necessary to provide legal counsel related to the day-to-day operations of the Debtors' businesses, it would be unwieldy and burdensome to both the Debtors and this Court to request each such OCP to apply separately for approval of its employment and compensation. The Debtors seek permission to continue to employ the OCPs postpetition without the necessity of each OCP filing a formal application for employment and compensation pursuant to the Bankruptcy Code and pursuant to the compensation procedures set forth in the Motion.

> **(8)**    ***Debtors' Motion for Establishment of (I) Procedures For Monthly Compensation And Reimbursement of Expenses of Professionals and (II) Allocation of Fees and Expenses Amongst Affiliated Debtors***

97.    The Debtors' seek to establish procedures for monthly compensation and reimbursement of expenses for professionals.  The Debtors believe that the relief requested in this Motion will streamline the professional compensation process and enable the Court and all other parties to monitor the professional fees incurred in these cases more effectively.  The Motion will assist with minimizing the financial hardship on the Professionals and enable the Debtors to better monitor administrative costs and forecast level cash flows.

* * * * * * * *

98.    I have reviewed the First Day Motions and the facts stated therein are true and correct to the best of my information and belief, and I believe the relief sought in each of the First Day Motions: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to business operations and the Debtors' patients and (b) constitutes a critical element in achieving a successful reorganization of the Debtors.

By: _____

Name: _Louis E. Robichaux IV_

Title: _Chief Restructuring Officer_

SWORN to and subscribed before me

this _5th_ day of _March_ , 2020.

_Tammy Rhoades_ (L.S.)

Notary Public for _State of Tennessee_

My Commission Expires: _July 3, 2023_



TAMMY RHOADES
STATE
OF
TENNESSEE
NOTARY
PUBLIC
DAVIDSON COUNTY