UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | CASE NO. 20-10247 |
| Randolph Hospital, Inc. d/b/a Randolph | ) | |
| Health, | ) | CHAPTER 11 |
| | ) | |
| Debtors.[1] | ) | |

## DEBTORS' DESIGNATION OF EXHIBITS FOR FEBRUARY 4, 2021 HEARING

Randolph Hospital, Inc. d/b/a Randolph Health and certain of its affiliates, debtors-in-possession in the above-captioned bankruptcy cases (the "Debtors"), by and through its undersigned counsel, hereby file this designation of Exhibits in connection with the virtual hearing scheduled for February 4, 2021 at 9:30a.m.:

Exhibit 1: 2nd Amendment to Asset Purchase Agreement with Interim Management Agreement and Leaseback Agreement

Respectfully submitted, this the 3rd day of February, 2021.

HENDREN, REDWINE & MALONE, PLLC

s/Rebecca F. Redwine
Jason L. Hendren (NC State Bar 26869)
Rebecca F. Redwine (NC State Bar 37012)
Benjamin E.F.B. Waller (NC State Bar 27680)
4600 Marriott Drive, Suite 150
Raleigh, NC  27612
Telephone:  (919) 420-7867
Facsimile:  (919) 420-0475
Email:  jhendren@hendrenmalone.com
rredwine@hendrenmalone.com
bwaller@hendrenmalone.com

---

[1] The Debtors in this case, along with each Debtor's case number, are:  Randolph Hospital, Inc. d/b/a Randolph Health, Case No. 20-10247; Randolph Specialty Group Practice, Case No. 20-10248; and MRI of Asheboro, LLC d/b/a Randolph MRI Center, Case No. 20-10249.  These Chapter 11 cases have been consolidated for procedural purposes and are being jointly administered pursuant to an Order entered in each case on March 12, 2020.

**NELSON MULLINS RILEY & SCARBOROUGH LLP**
Jody A. Bedenbaugh D.S.C. ID No. 9210
Graham S. Mitchell D.S.C. ID No. 11763
Dylan G. Trache Va Bar No. 45939
1320 Main Street / 17th Floor
Post Office Box 11070 (29211)
Columbia, SC  29201
Telephone: (803) 799-2000
Facsimile: (803) 256-7500
jody.bedenbaugh@nelsonmullins.com
graham.mitchell@nelsonmullins.com
dylan.trache@nelsonmullins.com

CO-COUNSEL FOR THE
DEBTORS-IN-POSSESSION

Exhibit 1

## SECOND AMENDMENT TO
## ASSET PURCHASE AGREEMENT

**THIS SECOND AMENDMENT TO ASSET PURCHASE AGREEMENT** (this "Second Amendment") is dated as of January 14, 2021, by and between **RANDOLPH HOSPITAL, INC., d/b/a RANDOLPH HEALTH**, a North Carolina nonprofit corporation ("Randolph"), **RANDOLPH SPECIALTY GROUP PRACTICE**, a North Carolina nonprofit corporation ("RSGP"), **MRI OF ASHEBORO, LLC, d/b/a RANDOLPH HEALTH MRI CENTER**, a North Carolina limited liability company ("MRI Center") (Randolph, RSGP, and MRI Center, are referred to collectively herein as "Sellers" and each individually as a "Seller"), and **AMERICAN HEALTHCARE SYSTEMS, LLC**, a Virginia limited liability company ("Buyer").

### Recitals:

**A.**     On March 6, 2020, Randolph and certain of its affiliates each filed a voluntary petition for relief (collectively, the "Bankruptcy Cases") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

**B.**     The Bankruptcy Cases are jointly administered under Lead Case No. 20-10247 and are currently pending in the Bankruptcy Court for the Middle District of North Carolina (the "Bankruptcy Court").

**C.**     The Parties entered into an Asset Purchase Agreement dated October 8, 2020 (the "APA"), as amended by that certain First Amendment to Asset Purchase Agreement dated December 28, 2020 (the "First Amendment" and, together with the APA, the "Agreement"), under which Buyer has agreed to acquire certain assets (collectively, the "Acquired Assets), and assumed certain liabilities, of the Sellers.

**D.**     Randolph operates healthcare facilities, including Randolph Health, a 145-bed general acute care hospital with its primary location in Asheboro, North Carolina and other related healthcare facilities (collectively, the "Hospital") at such other locations where the Hospital's services are provided (collectively, the "Hospital Premises").

**E.**     Buyer will be the owner of the Acquired Assets purchased by Buyer under the APA as the operator of the Hospital.

**F.**     Buyer and Seller wish to amend the Agreement in order to provide (i) for entry into an Interim Management Agreement of even date herewith and commencing at the Closing Date to enable Buyer to manage the day-to-day operations of the Hospital following the Closing Date until Buyer is issued the New Licenses (as defined below) necessary for Buyer to operate the Hospital; (ii) that the portion of the Acquired Assets constituting (a) drugs, dangerous devices, pharmacy systems, and other pharmacy assets and (b) Payor agreements shall transfer to Buyer as of the date the New Licenses are issued; and (iii) for entry of a Leaseback Agreement of even date herewith to enable Buyer to lease to Randolph all of the then-acquired Acquired Assets used in the operation of the Hospital until Buyer obtains its New Licenses.

**G.**    Capitalized terms used but not otherwise defined in this Second Amendment shall have the meanings given to them in the Agreement.

**NOW, THEREFORE**, in consideration of the premises and of the mutual agreements and covenants hereinafter set forth, the Parties agree as follows:

1.    <u>**Amendments to Agreement.**</u>

**(a)**    Article 4, Section 4.1 of the Agreement is amended by adding the following to the end of the existing terms:

> Buyer and Sellers agree that because the change of ownership and regulatory approval process may take an extended period of time, at the Closing Date, the Acquired Assets (other than (a) any assets constituting drugs, dangerous devices, pharmacy systems, or other pharmacy assets (collectively, the "<u>Pharmacy Assets</u>"), (b) the Payor agreements (collectively with the Pharmacy Assets, the "<u>Licensure Date Assets</u>"), and (c) Randolph's membership interest in Randolph Cancer Center, LLC and Randolph's interest in StayWell Senior Care)  will be sold to Buyer and immediately leased back to Sellers (substantially in the form of the Leaseback Agreement attached hereto as Exhibit A, the "<u>Leaseback Agreement</u>"), with a concurrent management arrangement (substantially in the form of the Interim Management Agreement attached hereto as Exhibit B), the "<u>IMA</u>").    On the effective date that Buyer obtains all required licenses, permits, and approvals required to operate the Acquired Assets, including its general acute care hospital license from the NC DHHS, the hospital pharmacy permit from the North Carolina Board of Pharmacy, and all other licenses required to operate the Hospital (together, the "<u>New Licenses</u>," and the date on which the New Licenses are issued is the "<u>Licensure Date</u>"), (i) the Leaseback Agreement and IMA will terminate and (ii) the Licensure Date Assets will be transferred to Buyer (without payment of any additional Purchase Price). For the avoidance of any doubt, the Licensure Date shall be the date the Buyer's hospital license and pharmacy permit are effective, even if they are not actually issued until a later date.

**(b)**    Article 4, Section 4.2 is amended by adding a new subsection (g) thereof, as follows:

> (g)    the Leaseback Agreement and the IMA, duly executed by Sellers.

**(c)**    Article 4, Section 4.3 is amended by adding a new subsection (i) thereof, as follows:

> (i)    the Leaseback Agreement and the IMA, duly executed by Buyer.

**(d)**    Section 2 of the First Amendment is amended by revising clause (b) thereof as follows:

(b) as to Schedule 2.1(f) – Licenses, Schedule 2.2(l) – Assigned Provider Numbers, Schedule 2.1(m) – Grant Funds, and Schedule 2.2(g) – Excluded Financial Assets, each of which shall be updated to reflect current information as of the Closing Date.

2.    **Effect on the Agreement.**    This Second Amendment shall be deemed to be effective as of the Closing Date.  The Parties reserve all rights under the original terms of the Agreement until the Second Amendment is effective and, except as set forth in this Second Amendment as of its effective date, the terms and conditions of the Agreement are hereby ratified and declared to be in full force and effect.  This Second Amendment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

3

**IN WITNESS WHEREOF**, the Parties have executed this Second Amendment to be effective as of the Closing Date.

**SELLERS:**

**RANDOLPH HOSPITAL, INC., d/b/a RANDOLPH HEALTH**, a North Carolina nonprofit corporation

By:_____
Name:_____
Title:_____

**RANDOLPH SPECIALTY GROUP PRACTICE**, a North Carolina nonprofit corporation

By:_____
Name:_____
Title:_____

**MRI OF ASHEBORO, LLC, d/b/a RANDOLPH HEALTH MRI CENTER**, a North Carolina limited liability company

By:_____
Name:_____
Title:_____

**BUYER:**

**AMERICAN HEALTHCARE SYSTEMS, LLC**, a Virginia limited liability company

By:_____
Name:_____
Title:_____

4

AGREED TO AND ACKNOWLEDGED BY:

**RANDOLPH HOSPITAL COMMUNITY
HEALTH FOUNDATION, d/b/a RANDOLPH
HEALTH COMMUNITY FOUNDATION**

By:_____

Name:_____

Title:_____

5

## INTERIM MANAGEMENT AGREEMENT

**THIS INTERIM MANAGEMENT AGREEMENT** (this "**Agreement**") is made and entered into as of _____, 2021 (the "**Signing Date**") by and between **RANDOLPH HOSPITAL, INC., d/b/a RANDOLPH HEALTH**, a North Carolina nonprofit corporation, **RANDOLPH SPECIALTY GROUP PRACTICE**, a North Carolina nonprofit corporation, **MRI OF ASHEBORO, LLC, d/b/a RANDOLPH HEALTH MRI CENTER**, a North Carolina limited liability company (collectively, "**Randolph**") on the one hand, and **AMERICAN HEALTHCARE SYSTEMS, LLC**, a Virginia limited liability company ("**Buyer**") on the other hand. Randolph and Buyer may be referred to herein individually as a "**Party**," and collectively as the "**Parties**."

## RECITALS

**A.**     On March 6, 2020, Randolph and certain of its affiliates each filed a voluntary petition for relief (collectively, the "**Bankruptcy Cases**") under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**").

**B.**     The Bankruptcy Cases are jointly administered under Lead Case No. 20-10247 and are currently pending in the Bankruptcy Court for the Middle District of North Carolina (the "**Bankruptcy Court**").

**C.**     Buyer, as purchaser, and Randolph, as seller, entered into that certain Asset Purchase Agreement, dated as of October 8, 2020, (the "**APA**"), as amended, which provides for the sale of certain assets of Randolph (collectively, the "**Acquired Assets**").   All terms not otherwise defined herein shall have the meanings ascribed to them in the APA.

**D.**     Randolph operates healthcare facilities, including Randolph Health, a 145-bed general acute care hospital with its primary location in Asheboro, North Carolina and other related healthcare facilities (collectively, the "**Hospital**") at such other locations where Randolph's services are provided (collectively, the "**Hospital Premises**").

**E.**     Buyer has requested this Agreement to afford Buyer additional time to obtain its general acute care hospital license from the North Carolina Department of Health and Human Services, Division of Health Service Regulation ("**NC DHHS**"), the hospital pharmacy permit from the North Carolina Board of Pharmacy, and all other licenses required to operate the Hospital (together, the "**New Licenses**," and the date on which the New Licenses are issued is the "**Licensure Date**").

**F.**     That portion of the Acquired Assets constituting drugs, dangerous devices, pharmacy systems, or other pharmacy assets (the "**Pharmacy Assets**") and Payor agreements (together with the Pharmacy Assets, the "**Licensure Date Assets**") shall transfer to Buyer as of the Licensure Date.

**G.**     Randolph shall maintain a possessory interest in the Hospital and the management of the Hospital Premises, and Buyer on the one hand, as lessor, and Randolph on the other hand, as lessee, are entering into that certain Leaseback Agreement of even date herewith, pursuant to

which certain of Randolph's Assets will be leased back to Randolph (the "**Leaseback Agreement**").

H.      Until Buyer obtains the New Licenses, Buyer desires to assume the management of the Hospital, including its pharmacy, on behalf of Randolph, and Randolph desires to avail itself of such management services, upon the terms and conditions set forth in this Agreement.

## TERMS OF AGREEMENT

**NOW, THEREFORE**, in consideration of the promises and the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.      **Term**.

1.1.      The term of this Agreement (the "**Management Period**") shall commence as of the Closing Date (as defined in the APA) and shall continue until the earlier of (a) the Licensure Date, or (b) the later of (i) May 31, 2021 or (ii) the date on which the bankruptcy court enters an order confirming a Plan (as defined below). The Parties acknowledge that, during the Management Period, Randolph shall remain the licensee of the Hospital, and in that capacity, and during such period, shall retain statutory and regulatory authority and responsibility for the Hospital and for oversight of Buyer.

2.      **Acknowledgements and Covenants**.

2.1.      As of the Closing Date, Buyer shall have acquired all of the Acquired Assets as set forth in the APA (other than the Licensure Date Assets), and such assets other than Randolph's membership interest in Randolph Cancer Center, LLC and Randolph's member interest in StayWell Senior Care, but including the real property used in connection with the operation of the Hospital and Hospital Premises, shall be leased back to Randolph pursuant to the terms of the Leaseback Agreement during the Management Period.

2.2.      Contemporaneously with the Licensure Date and the termination of the Leaseback Agreement, ownership of the Licensure Date Assets shall be transferred to Buyer. Buyer acknowledges that this Agreement and the foregoing subsequent transfer of the Licensure Date Assets are made at the request of Buyer to provide more time for Buyer to obtain its New Licenses. As such, Buyer acknowledges, covenants, and agrees that the Purchase Price (as defined in the APA) shall be paid to Randolph under the APA as if the Licensure Date Assets were transferred as of the Closing Date.

2.3.      As of the Closing Date, Randolph shall have ended the employment or engagement of all employees and contractors and, to the extent they received offers of employment or engagement from Buyer (or its affiliates) and accepted such offers, shall have been transferred to Buyer (or its affiliate) as employees or contractors of Buyer (or its affiliate) (collectively, the "**Hired Employees**").

2.4.      During the Management Period, Randolph will (a) assign an individual to oversee the operation of the Hospital and serve as the Chief Executive Officer of Randolph, as

2

required by the Centers for Medicare & Medicaid Services, NC DHHS, and applicable North Carolina laws and regulations (the "**Responsible Officer**"), and (b) maintain proper oversight by a board of directors.

### 3.    Appointment of Buyer as Manager.

**3.1.**    During the Management Period, Randolph hereby appoints Buyer as the sole and exclusive provider of the Services (defined below) and hereby grants to Buyer the exclusive right to manage the Hospital and Hospital Premises under Randolph's Licenses (as defined in the APA) as a licensed healthcare facility, including without limitation, the right to undertake those certain management responsibilities and permitted activities described in Section 4 below.  Buyer hereby accepts such appointment for all purposes with respect to Randolph's rights, duties, and responsibilities under the Licenses for the Hospital, to the fullest extent permitted by law, and agrees, to the fullest extent permitted by law, to provide management services to the Hospital on behalf of Randolph (the "**Services**").

**3.2.**    Buyer's Services hereunder shall include management and operation of the Hospital's pharmacy on behalf of the Hospital, even though the Pharmacy Assets will not be transferred to Buyer pursuant to the APA until the Licensure Date.

**3.3.**    Upon the Licensure Date, Buyer's Services provided to the Hospital under Randolph's Licenses shall terminate and, thereafter, Buyer (and its affiliates) will be operating the Hospital as the licensee holding its own New Licenses.

**3.4.**    During the Management Period, Buyer shall submit claims for services rendered by the Hospital to various governmental and non-governmental entities, patients, and other third parties pursuant to Randolph's Payor agreements and the Medicare, Medicaid, and other similar provider numbers of the Hospital set forth in Schedule 2.1(l) to the APA (collectively, "**Randolph's Billing Credentials**").  Because all billing and collecting shall be under Randolph's Billing Credentials, payments shall be made in Randolph's name and deposited in Randolph's bank accounts.    The Parties acknowledge and agree that during the Management Period, Randolph's bank accounts and lockboxes shall remain under Randolph's name and in Randolph's control unless expressly provided otherwise in Section 4.5 hereto.  Notwithstanding anything to the contrary in this Agreement, the Parties acknowledge and agree that Buyer's right to bill and collect under Randolph's Billing Credentials for services rendered by the Hospital that are payable by Medicare shall continue after the expiration of this Agreement until such time as the processing of the transfer of Randolph's Medicare provider agreements to Buyer has been completed, as evidenced by the issuance of the provider "tie-in notice" in the name of Buyer (the "**Tie-In Notice**"). Buyer shall indemnify and hold Randolph harmless for any and all costs or liabilities incurred by Randolph as a result of Buyer's use of Randolph's Billing Credentials or any breach of the terms and conditions of Randolph's Billing Credentials during the period of such use by Buyer. Each Party shall have the right to audit by an independent and competent auditor, at the requesting Party's sole expense, the bank records and remittance advices of the other Party with respect to claims submitted and payments made in connection with this Section 3.4.  Thereafter, upon the findings of such auditor that there has either been an overpayment or underpayment of funds due, the Party owing funds shall, within five (5) business days, make payment of such funds to the Party to whom they are owed.

3

**3.5.**     Randolph shall retain and, upon the Licensure Date, Buyer shall assume, any contracts necessary for Randolph to continue to be the holder of the Licenses and to bill for Hospital services during the Management Period, in accordance with the APA.  Such contracts shall be as set forth in <u>Schedule 3.6</u>, attached hereto (the "**Retained Contracts**").  Buyer hereby designates each Retained Contract as an Assigned Contract under Section 2.1(d) of the APA.

4.     **Management Responsibility.**

**4.1.**     During the Management Period, Buyer shall, subject to all applicable legal and regulatory requirements and Randolph's ultimate oversight and control, have responsibility for the management of the Hospital, and agree to assume and discharge all of Buyer's responsibilities, duties, liabilities, payments, and obligations in connection with properly maintaining the Hospital in full compliance with all regulations and standards required of a licensed healthcare facility so licensed.  In furtherance thereof, Buyer's Services shall include, but not be limited to, the following duties, which duties shall be performed at Buyer's sole cost and expense:

**(a)**     Managing the operations of the Hospital as a licensed healthcare facility in compliance with all applicable laws, regulations, provider agreements, Payor contracts, NC DHHS requirements for maintenance of the Licenses in good standing, Medicare conditions of participation and requirements for payment with respect to governmental programs, and the requirements for maintenance of the Hospital's accreditations;

**(b)**     Employing and managing the Hired Employees and any other non-clinical and clinical personnel (i) deemed necessary by Randolph for the operation of the Hospital as a licensed healthcare facility, or (ii) required by law so as to meet all applicable labor laws and regulations, and consistent with orders of the Bankruptcy Court;

**(c)**     Maintaining and repairing, as needed, the Hospital Premises so as to ensure material compliance with all applicable local, state and federal law, and construction timelines imposed by the North Carolina Division of Health Service Regulation, Healthcare Planning and Certificate of Need Section;

**(d)**     Providing security services reasonably necessary to prevent unlawful entry or damage to the Hospital Premises;

**(e)**     Affording the Responsible Officer or his or her designee access, during normal business hours, to the Hospital Premises, the books and records at the Hospital Premises or in Buyer's possession, the Hired Employees and any other personnel of Buyer or otherwise who are providing services associated with the operation of the Hospital, and such other access and assistance as reasonably requested by the Responsible Officer;

**(f)**     Upon at least one (1) day's prior written notice to Buyer, providing access, during normal business hours, to the Hospital Premises to lessors of equipment at the Hospital Premises, if any, who have been authorized by order of the Bankruptcy Court to remove their equipment from the Hospital Premises, provided that Buyer shall have full power and authority to require that the removal of such equipment by such lessors does not damage the Hospital Premises;

4

(g)     Providing access, during normal business hours, to the Hospital, the Hospital Premises, the Hospital's books and records, electronic health records, financial information systems, operating systems, laboratory systems, the Hired Employees and any other personnel of Buyer or otherwise who are providing services associated with the operation of the Hospital, to Randolph, Randolph's directors, officers and representatives, and Randolph's successors in interest, including, but not limited to, any plan administrator, debtor representative, liquidating trustee, oversight or advisory committee, or similar representatives appointed or approved by the Bankruptcy Court for the purpose of winding down Randolph's affairs, pursuing litigation and adversary proceedings, and to effectuate a plan of liquidation, as approved by the Bankruptcy Court (the "**Plan**"), *provided, however*, that such access does not unreasonably disrupt the Hospital's operations;

(h)     Maintaining all licenses, permits, consents, approvals, accreditations, and certifications currently held by Randolph in good standing, in active status, and in compliance with all applicable local, state, and federal laws, including the timely payment of all applicable fees to support or renew these approvals;

(i)     Obtaining and maintaining all insurance coverages, from and after the Closing Date, for the Hospital that a prudent hospital operator or owner would maintain, including directors and officers insurance with no less coverage than that which was maintained for directors and officers immediately prior to the Closing Date;

(j)     Obtaining and maintaining those insurance coverages required under the Leaseback Agreement, for its own account, with Randolph included as a named insured, and paying all amounts required under the Leaseback Agreement in a timely manner, including rent, utilities, taxes, and insurance premiums;

(k)     Opening and forwarding all mail relating to the financial or business affairs of Randolph to the notice address below;

(l)     Periodically reporting to Randolph (or its designee), either in person or telephonically, the condition of the Hospital and the Hospital Premises;

(m)     Coordinating with the Board of Directors and the organized Medical Staff (each, as established by Randolph) on the appropriateness and quality of medical care and all Medical Staff issues requiring governing board oversight;

(n)     Paying all costs and expenses in connection with and incidental to the ownership of Randolph's Assets (including both the Acquired Assets and the Licensure Date Assets) and the management and operation of the Hospital hereunder, including but not limited to, all the Hospital's operating costs, employee-related costs, and taxes, whether or not identified, described, or referenced in this Agreement;

(o)     Cooperating with Randolph in facilitating the termination and release of any encumbrances on Randolph's bank accounts and lockboxes; and

(p)     Performing such other duties and activities as are reasonably necessary for Buyer to fulfill its responsibilities under this Agreement and the APA.

**4.2.**    Permitted Buyer Activities.  During the Management Period, Buyer may do any of the following, in consultation with Randolph and subject to the requirements of applicable local, state, and federal law, which activities may be performed by Buyer at Buyer's sole cost and expense:

**(a)**    Make alterations, improvements, and repairs to the interior or exterior of the Hospital Premises, including structural alterations, improvements, and repairs;

**(b)**    Remove and dispose of furniture, fixtures, equipment (other than equipment owned by equipment lessors), and supplies at the Hospital Premises;

**(c)**    Move into and install furniture, fixtures, equipment, and supplies at the Hospital Premises;

**(d)**    If applicable, prepare the Hospital for a name change, except that no such name change may take effect, and no signage reflecting such change shall be installed, during the Management Period; and

**(e)**    Perform, or permit to be performed, any other activities at the Hospital Premises that are not inconsistent with operating the Hospital under the Licenses.

**4.3.**    Prohibited Buyer Activities.

**(a)**    Notwithstanding anything to the contrary in this Agreement, Buyer shall have no authority to take and shall not take any action with respect to any Excluded Assets or Excluded Liabilities (as such terms are defined in the APA) of Randolph.

**(b)**    Buyer's authority to manage and operate the Hospital is limited to those actions that Buyer is expressly required or permitted to do hereunder.

**(c)**    Buyer shall not take any action that interferes with Randolph's ability to receive or retain funds that constitute proceeds of receivables for services provided on or before the Closing Date or that otherwise constitute an Excluded Asset or are the proceeds thereof; provided, however, that this Section 4.3(c) shall be without prejudice to Buyer receiving the compensation owed and payable to Buyer for the collection of accounts receivable arising from patient services rendered prior to the Closing Date pursuant to APA Section 2.2 (the "**Buyer Commission**").

**4.4.**    APA Provisions.

**(a)**    Nothing herein shall modify the prorations of expenses set forth in the APA.

**(b)**    None of the information accessed, learned, or obtained by Buyer or any of Buyer's affiliates in the course of performing its duties hereunder may serve as the basis for payment of less than the full Purchase Price or to otherwise assert a claim against Randolph.

6

(c)     Nothing herein shall modify the transfer of the Acquired Assets from Randolph to Buyer as contemplated in the APA.

(d)     Nothing herein shall modify the APA in respect of the exclusion from purchase by Buyer of the Excluded Assets.

(e)     Nothing herein shall modify the APA in respect of the terms and conditions of the billing and A/R collections, including Buyer's obligation to collect accounts receivable existing on the Closing Date and transfer the proceeds of such accounts receivable to Randolph for the benefit of Bank of America, N.A. ("**BofA**") as provided in Section 2.2 of the APA.

**4.5.**    Distribution of Collections of Accounts Receivable.

(a)     Notwithstanding anything in this Agreement to the contrary, to the extent Randolph possesses, receives or otherwise controls any property that is an Acquired Asset as defined in the APA (including, for the avoidance of doubt, any proceeds thereof) after the Closing Date, Randolph shall hold such property in trust for the benefit of Buyer and transfer such property to Buyer as provided in this Agreement, the APA or as otherwise agreed by the Parties. Notwithstanding anything in this Agreement to the contrary, to the extent Buyer possesses, receives or otherwise controls any property that is an Excluded Asset as defined in the APA (including, for the avoidance of doubt, any proceeds thereof) after the Closing Date, Buyer shall hold such property in trust for the benefit of Randolph and transfer such property to Randolph as provided in this Agreement, the APA or as otherwise agreed by the Parties.

(b)     Under no circumstance shall Buyer seek payment for Buyer's Services from any liquidating trustee or liquidating trust appointed or established under any bankruptcy plan, Randolph, its bankruptcy estates, any of any of Randolph's officers, directors, agents, contractors, personnel, affiliates or subsidiaries.

(c)     Notwithstanding anything to the contrary in this Agreement, the Parties acknowledge and agree that Buyer's right to bill and collect with Randolph's Billing Credentials shall continue after the expiration of the Management Period until such time as the Tie-In Notice is issued and all payments billed with Randolph's Billing Credentials are received.

(d)     Within three (3) business days of the Closing Date, Randolph shall instruct the financial institutions that maintain or otherwise service its deposit accounts or lockboxes that are dedicated to the receipt of collections of accounts receivable for patient services (each, whether a lockbox or deposit account, a "**Patient Services Deposit Account**", and collectively the "**Patient Services Deposit Accounts**"), including those deposit accounts indicated in Schedule 4.5(d) hereto, to:

(i)     first transfer all amounts deposited in the Patient Services Deposit Accounts on or before the Closing Date into a separate dedicated deposit account of Randolph as agreed to by BofA (the "**Randolph Receivable Account**") and subject to a deposit account control agreement by and among the applicable financial institution, Randolph and BofA; and then

7

**(ii)** sweep on a daily basis commencing the next business day following the transfer described in Section 4.5(d)(i) any amounts deposited into a Patient Services Deposit Account into a separate dedicated deposit account of Randolph as agreed to by BofA and subject to a deposit account control agreement by and among the applicable financial institution, Randolph, BofA, and Buyer (the "**Administrative Patient Receivable Account**" or the "**APRA**").

**(e)** With regard to the Administrative Patient Receivable Account:

**(i)** Buyer shall have the ability to direct transfers from the APRA, or alternatively Randolph shall facilitate any such directive of Buyer, in accordance with APA Section 2.2 or as otherwise permitted or provided for by Section 4.5(f) hereof.

**(ii)** No later than three (3) business days after the Reconciliation Payment Deadline (as defined below), Buyer shall provide the APRA Reconciliation (as defined below) to any party to the deposit account control agreement for the APRA provided for under Section 4.5(d)(ii).

**(iii)** "**Reconciliation Payment Deadline**" means, as applicable, the fourteenth day following the Closing Date (the "**Two Week PC Date**") and then, commencing on the first full calendar month following the Two Week PC Date, the last day of the calendar month.

**(iv)** "**APRA Reconciliation**" means reconciliation information substantially in the form of Exhibit B hereto concerning any funds deposited into the APRA, any transfers from the APRA and that describes the applicable Buyer Commission.

**(f)** All payments deposited into the APRA or received by Buyer after the Closing Date with respect to the Business including all payments from third party payors (such as the Medicare program, the Medicaid program or the Veteran's Administration), managed care companies, health maintenance organizations, any private Person or otherwise a Payor as defined in the APA shall be handled as follows (with payments to be forwarded to be held in trust for the benefit of the recipient pending such transfer):

**(i)** As to any amounts otherwise subject to be transferred to the Randolph Receivable Account under Section 4.5(f)(ii), (iv) or (v):

(1) Buyer shall direct the transfer of or retain, as applicable, the amount of the applicable Buyer Commission.

(2) Remaining amounts in excess of the applicable Buyer Commission shall be transferred to the deposit account for the A/R Escrow provided for in APA Section 2.2 up until such transferred amounts total $500,000.00, and then any excess amounts shall be subject to transfer to the Randolph Receivable Account as provided under Section 4.5(f)(ii), (iv) or (v).

**(ii)** To the extent the accompanying or associated remittance information indicates or the Parties otherwise agree that payments relate to services for the period on or before the Closing Date, such payments shall be forwarded to the Randolph Receivable

8

Account no later than the Reconciliation Payment Deadline along with the applicable remittance advice.

          **(iii)**     To the extent the accompanying or associated remittance information indicates or the Parties otherwise agree that payments relate to services for the period after the Closing Date, such payments shall be forwarded to Buyer no later than the Reconciliation Payment Deadline or retained by Buyer, as applicable, along with the applicable remittance advice.

          **(iv)**     To the extent the accompanying or associated remittance information indicates or the Parties otherwise agree that payments relate to services for periods on or before and after the Closing Date, then, pursuant to APA Section 2.2(k), the portion thereof which relates to services for the period after the Closing Date shall be forwarded to Buyer no later than the Reconciliation Payment Deadline or retained by Buyer, as applicable, and the portion thereof that relates to services for the period on or before the Closing Date shall be remitted to the Randolph Receivable Account no later than the Reconciliation Payment Deadline.

          **(v)**     To the extent the accompanying or associated remittance information does not indicate and the Parties do not otherwise agree as to whether payments relate to services for the period on or before the Closing Date or the period thereafter, such payments shall be applied and transferred by the Reconciliation Payment Deadline or retained, as applicable, as follows:

          (1)     for the first thirty (30) days after the Closing Date, 100% of such payments shall be applied to reduce the patient balances for the period on or before the Closing Date for accounts receivable not in excess of six (6) months old (after reduction for any contractual allowances) until the balance is zero (and any amount so applied shall be transferred to the Randolph Receivable Account), and any remainder will be applied to reduce any balances due for services rendered by Buyer after the Closing Date (and any amount so applied shall be transferred to or retained by Buyer, as applicable);

          (2)     thereafter, all non-designated payments shall be applied 100% to reduce the patient balances for the period after the Closing Date until the balance is zero (and any amount so applied will be transferred to or retained by Buyer, as applicable), and any remainder will be applied to reduce balances due for services rendered by Randolph on or before the Closing Date (and any amount so applied shall be transferred to the Randolph Receivable Account).

          **(g)**     Randolph shall issue invoices to Buyer on a weekly basis, if necessary, with reasonable supporting detail for all costs and expenses incurred by Randolph for the purchase of drugs and dangerous devices that Buyer determines are necessary for the operation of the Hospital and other reasonable costs and expenses incurred by Randolph for the benefit of Buyer in the operation of the Acquired Assets and Buyer shall pay such undisputed invoices within ten (10) business days of receipt of such invoices. If Buyer does not remit payment in respect of such invoices in accordance with the immediately preceding sentence, the unpaid amount of such invoices shall bear interest at the Wall Street Journal Prime Rate in effect on the calendar day upon

which such payment was required to be made to Randolph (the "**Invoice Payment Due Date**") plus five percent (5%) (or the maximum rate allowed by law, whichever is less), such interest accruing on each calendar day after the Invoice Payment Due Date until payment of such invoices and all interest thereon is made to Randolph.

> **4.6.**    Liabilities and Losses.

> > **(a)**    Buyer shall be responsible for all the Hospital liabilities and losses incurred or accrued during the Management Period.

> > **(b)**    Nothing hereunder shall, or is intended to, modify or supersede Buyer's responsibility for the Assumed Liabilities (as defined in the APA) or Randolph's responsibility for the Excluded Liabilities (as defined in the APA).

> **4.7.**    Randolph's Ultimate Control.    Notwithstanding anything to the contrary in this Section 4 or in this Agreement more generally, Randolph, as holder of the Licenses, shall remain ultimately responsible for the operation of the Hospital, and may, at any time and from time-to-time during the Management Period, take any action (at Buyer's sole cost and expense) necessary to ensure Randolph's compliance with applicable laws and regulations, even if such action requires Randolph to intervene in Buyer's performance of Buyer's duties or permitted activities pursuant to this Section 4.

**5.**    **Continued Responsibility of Randolph.**

> **5.1.**    During the Management Period, Randolph shall maintain (at Buyer's sole cost and expense), and shall not take or voluntarily permit any actions which may adversely affect, Randolph's corporate existence and its full rights as the licensee under the Licenses.  In addition, during the Management Period, Randolph and its officers shall reasonably cooperate with Buyer (at Buyer's sole cost and expense) in Buyer's provision of the Services.

> **5.2.**    Notwithstanding the statutory and regulatory authority and responsibility of Randolph for the continued management of the Hospital during the Management Period, the Parties recognize and acknowledge that under this Agreement, Buyer shall, subject to the ultimate oversight by and approval of Randolph, be responsible for the day-to-day operation and maintenance of the Hospital as a licensed healthcare facility.  In the event that any violation or alleged violation of or non-compliance with any statute or regulation applicable to the operation or maintenance of the Hospital as a licensed healthcare facility certified by the Medicare and Medicaid programs occurs during the Management Period, then without regard to legal or statutory fault on the part of Buyer or of Randolph, Buyer shall immediately notify Randolph of such violation or alleged violation or non-compliance and take reasonable efforts to avoid or minimize any related adverse consequences. Buyer shall be responsible for the costs of any penalty, fine or remediation identified during the Management Period arising out of or relating to any act, omission, event or occurrence connected with the operation of the Hospital after the Closing Date, including, without limitation, the cost of engaging third party consultants or experts to help address or resolve the violation, alleged violation or non-compliance, and shall indemnify and hold Randolph harmless for the same in accordance with Section 8.2. Randolph retains the right to join Buyer in contesting said violations upon providing Buyer with notice of its intent to do so.

**5.3.** Randolph agrees to execute and deliver to Buyer such documents as Buyer may reasonably request to maintain the hospital license active and in good standing with NC DHHS and the other Licenses necessary or appropriate to maintain the Hospital as a licensed healthcare facility and to facilitate Buyer's obtaining of the New Licenses.

**6.** The Parties' Cooperation with Regulatory Agencies. Buyer shall use its best efforts to obtain the New Licenses as expeditiously as possible. Buyer shall provide updates to Randolph weekly, and as requested by Randolph, on the status of Buyer's efforts to obtain the New Licenses. To the extent not already submitted prior to the Closing Date, Buyer shall provide a copy of all such initial and supplementary or amended license applications for the New Licenses to Randolph at least two (2) business days prior to submission. Buyer shall cooperate with Randolph in the event Randolph requests revisions to a license application for a New License. Randolph shall, at Buyer's cost, reasonably cooperate with Buyer's efforts to obtain the New Licenses, and may communicate and coordinate with licensing agencies as necessary in connection with obtaining the New Licenses. Notwithstanding the foregoing, obtaining all governmental consents, approvals, assignments, authorizations, and clearances necessary to obtain the New Licenses shall be solely Buyer's (and not Randolph's) responsibility, including payment of any fees, expenses, filing costs, or other amounts related thereto.

**7.** **Risk of Loss.**

**7.1.** Randolph assumes no risks or liability for damage to or injury occurring on or to the Hospital Premises, Acquired Assets, or the Hospital during the term of this Agreement by any means whatsoever, including fire, storm, earthquake, vandalism, strike, cyberattack, accident, or any other casualty (collectively, "**Casualty**"), and Buyer shall have all right, title, and interest in and to the proceeds of any insurance it obtained and paid for covering such Casualty.

**7.2.** If, during the term of this Agreement, action is initiated to take the Hospital Premises or any portion thereof by eminent domain proceedings or by deed in lieu thereof (collectively, "**Condemnation**"), Buyer, and not Randolph, shall have all right, title, and interest in and to the award from the Condemnation.

**7.3.** In the event of a Casualty or Condemnation, neither Buyer nor Randolph may terminate this Agreement.

**8.** **Exculpation; Indemnification.**

**8.1.** Randolph and its bankruptcy estates, affiliates, members, officers, directors, employees, attorneys, accountants, consultants, agents, representatives, successors, and assigns, including the liquidating trustee and Responsible Officer (collectively "**Randolph Indemnified Parties**") shall have no liability in contract, tort, or otherwise unless and until a Chosen Court (as defined below) finds in a final, non-appealable judgment that any Damages (as defined below) result solely from a Randolph Indemnified Party's gross negligence or willful misconduct.

**8.2.** Buyer shall promptly and fully keep and hold Randolph Indemnified Parties forever harmless from, and shall indemnify and defend Randolph Indemnified Parties from and against, without regard to materiality, any and all obligations, judgments, fines, civil money penalties, sanctions, awards, liabilities, losses, penalties, claims, costs, demands, damages,

11

expenses, liens, and encumbrances, including investigation costs, time spent in depositions and reasonable attorneys' fees and expenses (collectively, "**Damages**"), whether civil or criminal, direct, indirect or consequential and no matter how arising, in any way related to, connected with, arising or resulting from, or under this Agreement, the APA, the Hired Employees (as defined in the APA), Buyer's performance of the Services, or the operation or management of the Hospital or Randolph's Assets, in each instance after the Closing Date. Notwithstanding the foregoing, the Parties understand that except as otherwise specifically provided for in the APA, Buyer is not, by virtue of this Agreement or any term or provision herein, assuming any claim, liability, expense, debt, or other obligation of Randolph that both relates to the operation or management of the Hospital or Randolph's Assets prior to the Closing Date and constitutes an Excluded Liability under the APA.

      **9.**      **HIPAA Compliance.**  Buyer agrees to take such steps as are necessary to ensure compliance with the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**") and other applicable federal and state privacy laws and regulations (collectively, the "**Privacy Laws**") with respect to the Hospital and its operations, and Randolph agrees not to take or voluntarily permit any actions which violate Privacy Laws with respect to the Hospital or its operations. Toward this end, Buyer and Randolph agree to execute and deliver that certain Business Associate Agreement, attached hereto as Exhibit A and incorporated by reference herein, upon execution of this Agreement.

      **10.**      **Further Assurances.**  Each of the Parties hereto agrees to execute and deliver any and all further agreements, documents, or instruments necessary to effectuate this Agreement and the transactions referred to herein or contemplated hereby or reasonably requested by the other Party hereto to perfect or evidence its rights hereunder.

      **11.**      **Relationship of the Parties.**  In performing their duties and permitted activities under this Agreement, Buyer and Randolph shall at all times be acting and performing as independent contractors. Buyer and Randolph are not partners or joint venturers with each other, and nothing herein shall be construed as making them partners or joint venturers or imposing upon any of them any liability as partners or joint venturers.

      **12.**      **Notices and Demands.**  All notices and demands, requests, consents, approvals, and other similar communications under this Agreement shall be in writing and shall be sent by personal delivery or by either (a) United States certified or registered mail, return receipt requested, postage prepaid, or (b) Federal Express or similar generally recognized overnight carrier regularly providing proof of delivery, addressed as follows:

      If to Randolph:               Randolph Hospital, Inc.
                                   364 White Oak Street
                                   Asheboro, North Carolina  27203
                                   Attention:  Louis E. Robichaux IV
                                   Chief Restructuring Officer
                                   Facsimile:  (336) 626-7664
                                   Telephone: (214) 924-1575
                                   Email:  louis.robichaux@ankura.com

12

| With copies to: | Nelson Mullins Riley & Scarborough LLP |
|---|---|
| (which copy shall not | Glenlake One, Suite 200 |
| constitute notice) | 4140 Parklake Avenue |
| | Raleigh, North Carolina 27612 |
| | Attention: Robert L. Wilson, Jr. |
| | Facsimile: (919) 329-3799 |
| | Telephone: (919) 329-3870 |
| | Email: bob.wilson@nelsonmullins.com |

and

| If to Buyer: | American Healthcare Systems, LLC |
|---|---|
| | Attn: Michael Sarian |
| | 1901 Avenue of the Stars, Suite 1060 |
| | Los Angeles, CA 90067 |

| With copies to: | Gill Law Firm, LLP |
|---|---|
| (which copy shall not | 1901 Avenue of the Stars, Suite 1060 |
| constitute notice) | Los Angeles, CA 90067 |
| | Attention: Faisal Gill |
| | Telephone: (310) 418-6675 |
| | E-mail: fgill@glawoffice.com |

Any notice so given by mail shall be deemed to have been given as of the date of delivery (whether accepted or refused) established by U.S. Post Office return receipt or the overnight carrier's proof of delivery, as the case may be, whether accepted or refused. Any such notice not so given shall be deemed given upon receipt of the same by the Party to whom the same is to be given. Any Party hereto may designate a different address for itself by notice to the other Party in accordance with this Section 12.

   **13.**   **Expenses.**   Except for Buyer's obligations to be responsible for certain costs, fees, and expenses as set forth elsewhere in this Agreement, each Party to this Agreement shall pay its own expenses in connection with the preparation of this Agreement and the consummation of the transactions contemplated hereby, including the fees of any attorneys, accountants, financial advisors, investment bankers or other professionals engaged by such Party.

   **14.**   **Entire Agreement.**   This Agreement, the Leaseback Agreement, and those provisions of the APA expressly identified in this Agreement, contain the entire agreement among the Parties with respect to the subject matter hereof and supersede all prior agreements, arrangements, and understandings relating to the subject matter hereof and thereof. There are no written or oral agreements, understandings, representations, or warranties between the Parties other than those set forth in this Agreement, the Leaseback Agreement, and those provisions of the APA expressly identified in this Agreement. Nothing in this Agreement modifies or shall be construed as modifying any orders entered by the Bankruptcy Court.

   **15.**   **Amendment.**   This Agreement may not be modified, amended, altered or supplemented except by a written agreement executed by all the Parties.

**16.    Waiver.**  Waiver by either Party of any breach or failure to comply with any provision of this Agreement by the other Party shall not be construed as or constitute, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any other provision of this Agreement.  No waiver of any such breach or failure or of any term or condition of this Agreement shall be effective unless in a written notice signed by the waiving Party and delivered, in the manner required for notices generally, to the affected Party.

**17.    Severability.**  In case any provision of this Agreement shall be found by a court of competent jurisdiction to be invalid, illegal, or unenforceable, such provision shall be construed and enforced as if it had been narrowly drawn so as not to be invalid, illegal, or unenforceable, and the validity, legality, and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby.

**18.    Successors and Assigns.**  This Agreement shall be binding upon, and shall inure to the benefit of, the Parties and their respective permitted successors and assigns.  Randolph shall not be permitted to assign its rights or its obligations under this Agreement without the prior consent of Buyer.  The Parties further acknowledge and agree that Buyer may assign any of its rights hereunder and/or delegate any of its obligations hereunder, so long as in each case Buyer remains responsible for such subcontracted goods or services and for any of such Buyer obligations hereunder.

**19.    Attorneys' Fees.**  In the event of any litigation or arbitration between the Parties arising out of this Agreement, the prevailing Party therein shall be allowed to recover from the other Party all court costs and reasonable attorneys' fees which shall be fixed by the court or arbitrator.

**20.    Headings.**  The descriptive headings of sections and subsections of this Agreement are inserted for convenience only and do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.

**21.    Governing Law**.  This Agreement shall be governed by and construed in accordance with the laws of the State of North Carolina without regard to its conflicts of laws principles or decisions, except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable federal law.

**22.    Jurisdiction.**  The Parties agree that the Bankruptcy Court shall have exclusive personal and subject matter jurisdiction over any action or proceeding with respect to any claim arising out of or related to this Agreement, and any of the documents or transactions contained in or contemplated by this Agreement; *provided, however*, that the Parties agree that the United States District Court for the Middle District of North Carolina (together with the Bankruptcy Court, the "**Chosen Courts**") shall have exclusive jurisdiction over such claim if (i) the Bankruptcy Cases are closed and if the Bankruptcy Cases are not reopened to adjudicate such claim after request by the Party bringing such claim, or (ii) the Bankruptcy Court determines that it does not have jurisdiction over such claim. Solely in connection with claims arising under this Agreement, or any of the documents or transactions contemplated hereby, the Parties (a) irrevocably submit to the exclusive jurisdiction of the Chosen Courts, (b) waive any objection to laying venue in any such action or proceeding in the Chosen Courts, (c) waive any objection that the Chosen Courts

14

are an inconvenient forum or do not have jurisdiction over any Party hereto, and (d) agree that service of process upon such Party in any such action or proceeding shall be effective if notice is given in accordance with Section 12 hereof.

      **23.**   **Commencement.**  The Parties acknowledge that commencement of Buyer's Services under this Agreement is subject to and contingent upon the occurrence of the Closing (as defined in the APA). The Management Period shall not commence, and the Parties' obligations during the Management Period shall not commence, unless and until the Closing has occurred.

      **24.**   **Cooperation on Regulatory Compliance Matters.**  Buyer understands and acknowledges that Randolph intends to comply with applicable federal and state laws, regulations, and guidance. In the event the terms of this Agreement need to be amended or supplemented based on guidance from or at the request or direction of a regulator made during the term of this Agreement. Buyer shall cooperate with such amendment and/or supplement to ensure Randolph's ability to comply with such guidance, request or directive.

      **25.**   **Counterparts.** This Agreement may be executed by one or more of the Parties on any number of separate counterparts (including by telecopy), and all of said counterparts taken together shall be deemed to constitute one and the same instrument. It may be delivered by facsimile or electronic transmission, including by e-mail as a PDF, and facsimile or PDF copies of executed signature pages, which shall be binding as originals.

      **26.**   **WAIVER OF JURY TRIAL.  TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (B) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 26.**

**IN WITNESS WHEREOF,** the Parties agree to the foregoing terms of agreement through the execution below by their respective, duly authorized representatives as of the Signing Date.

**RANDOLPH:**

**RANDOLPH HOSPITAL, INC., d/b/a RANDOLPH HEALTH,**
a North Carolina nonprofit corporation

By:_____
Name:_____
Title:_____

**RANDOLPH SPECIALTY GROUP PRACTICE,**
a North Carolina nonprofit corporation

By:_____
Name:_____
Title:_____

**MRI OF ASHEBORO, LLC, d/b/a RANDOLPH HEALTH MRI CENTER,**
a North Carolina limited liability company

By:_____
Name:_____
Title:_____

**BUYER:**

**AMERICAN HEALTHCARE SYSTEMS, LLC,**
a Virginia limited liability company

By:_____
Name:_____
Title:_____

*[Signature Page to Interim Management Agreement]*

## EXHIBIT A TO IMA

### BUSINESS ASSOCIATE AGREEMENT

**EXHIBIT B TO IMA**

**APRA RECONCILIATION**

Provider (entity or facility) | Patient Account Number | Date of Service | Discharge Date | Gross Charges | Contractual Allowance | Posting Date | Amount Received | Outstanding Balance | Buyer Commission

## SCHEDULE 3.6 TO IMA

### RETAINED CONTRACTS

All Medicare and Medicaid provider agreements associated with Randolph's Billing Credentials.

## SCHEDULE 4.5(D) TO IMA

| Account Owner | Financial Institution | Acct. # (last 4 digits) |
|---|---|---|
| Randolph Hospital, Inc. | First Horizon Bank | -7350 |
| Randolph Specialty Group Practice | First Horizon Bank | -5671 |
| MRI of Asheboro, LLC | First Horizon Bank | -7758 |

## LEASEBACK AGREEMENT

This Leaseback Agreement (the "**Leaseback Agreement**") is made and entered into as of _____, 2021 (the "**Signing Date**"), between **RANDOLPH HOSPITAL, INC., d/b/a RANDOLPH HEALTH**, a North Carolina nonprofit corporation, **RANDOLPH SPECIALTY GROUP PRACTICE**, a North Carolina nonprofit corporation, **MRI OF ASHEBORO, LLC, d/b/a RANDOLPH HEALTH MRI CENTER**, a North Carolina limited liability company (collectively, "**Randolph**") on the one hand, and **AMERICAN HEALTHCARE SYSTEMS, LLC**, a Virginia limited liability company ("**Buyer**") on the other hand. Randolph and Buyer may be referred to herein individually as a "**Party**," and collectively as the "**Parties**."

## RECITALS

A.     On March 6, 2020, Randolph and certain of its affiliates each filed a voluntary petition for relief (collectively, the "**Bankruptcy Cases**") under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**").

B.     The Bankruptcy Cases are jointly administered under Lead Case No. 20-10247 and are currently pending in the Bankruptcy Court for the Middle District of North Carolina (the "**Bankruptcy Court**").

C.     Buyer and Randolph have entered into that certain Asset Purchase Agreement, dated October 8, 2020 (the "**APA**"), as amended, which provides for the sale of the assets of Randolph and its related Affiliates (collectively, the "**Assets**").

D.     Randolph operates healthcare facilities, including Randolph Health, a 145-bed general acute care hospital with its primary location in Asheboro, North Carolina and other related healthcare facilities (collectively, the "**Hospital**") at such other locations where the Hospital's services are provided (collectively, the "**Hospital Premises**").

E.     Buyer will be the owner of the Assets purchased by Buyer under the APA as the operator of the Hospital.

F.     Randolph and Buyer are entering into that certain Interim Management Agreement ("**IMA**") of even date herewith, and commencing at the Closing Date to enable Buyer to manage the day-to-day operations of the Hospital following the Closing Date until Buyer is issued the Licenses necessary to operate the Hospital (for the avoidance of doubt, that date will occur when Buyer is issued both a license to operate the Hospital as an acute care hospital by the North Carolina Department of Health and Human Services, Division of Health Service Regulation, a permit to operate a hospital-based pharmacy by the North Carolina Board of Pharmacy, and all other licenses required to operate the Hospital (collectively, the "**New Licenses**")).

G.     Pursuant to the APA, at the Closing Date, Buyer will purchase Randolph's Assets, except for the Excluded Assets (as set forth in the APA). Additionally, that portion of the Assets constituting drugs, dangerous devices, pharmacy systems, or other pharmacy assets (the "**Pharmacy Assets**"), the Medicare Agreement, Medicaid Agreement, the assumed managed

1

care agreements and the assumed private payor agreements (collectively, the "**Licensure Date Assets**") shall transfer to Buyer as of the date the New Licenses are issued.

      **H.**    Immediately following the Closing, and until Buyer obtains the New Licenses, Buyer desires to lease back or license to Randolph all of the then-acquired Assets used in the operation of the Hospital, and Randolph desires to so lease or license such Assets from Buyer on the terms and conditions set forth herein. The Assets shall exclude the Licensure Date Assets, which Randolph shall own until the New Licenses are issued.

**AGREEMENT**

      **NOW, THEREFORE**, in consideration of the covenants and conditions contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

      **1.**    **Definitions.** Any capitalized term appearing herein that is not defined shall have the same definition ascribed to it under the IMA or the APA (as designated when such term first appears herein).

      **2.**    **Description of the Leased or Licensed Assets.**

      **2.1**    **Leased or Licensed Assets.** Buyer hereby leases or licenses to Randolph, and Randolph leases or licenses from Buyer, all of the Assets used in the operation of the Hospital, except for (i) the Licensure Date Assets, which Randolph shall continue to own until the such licenses are issued in the name of Buyer and (ii) Randolph's membership interest in Randolph Cancer Center, LLC and Randolph's interest in StayWell Senior Care, (collectively, the "**Leased or Licensed Assets**"). Specifically, the Leased or Licensed Assets shall include: (a) the Hospital Premises (which shall be leased); (b) tangible personal property, including, but not limited to, fixtures, furnishings, hard copy medical and financial records and equipment (including, but not limited to, hardware to operate and run the electronic health record systems, hospital operating systems, laboratory information systems, and financial reporting systems) (which shall be leased); and (c) intangible intellectual property saved or embodied in the electronic health record systems, hospital operating systems, laboratory information systems, and financial reporting systems (which shall be licensed for use by Randolph).

      **2.2**    **Management of Pharmacy and Use of Pharmacy Assets.**

      **(a)**    Randolph shall at all times during the term of this Leaseback Agreement be the owner of the Pharmacy Assets. The Parties acknowledge, however, that under the IMA, Buyer will be managing Randolph's pharmacy during the Management Period (as defined in the IMA), and Randolph therefore grants to Buyer (i) access to and authority to use the drugs, dangerous drug delivery devices, and/or other tangible pharmacy assets, and (ii) a license to use the intangible intellectual property saved or embodied in the pharmacy systems, in each case to the extent necessary for Buyer to fulfill its obligations under the IMA.

      **(b)**    Pursuant to the IMA, Randolph shall be responsible for purchasing drugs and dangerous devices identified by Buyer as necessary for the operations of the

Hospital, and Buyer shall reimburse Randolph for all costs and expenses incurred for such purchases.

**3.    Term; Termination.** This Leaseback Agreement shall have a term coextensive with the Management Period (as defined in the IMA) and shall automatically terminate upon the termination of the IMA.

**4.    Payments by Buyer.**

**4.1    Utilities.** Buyer shall pay all utilities and services supplied to the Hospital during the term hereof, including but not limited to water, gas, air conditioning, heat, light, power, telephone service, internet, cable TV, and waste removal services.

**4.2    Taxes.** Buyer shall pay all taxes, assessments, and levies of any kind or nature whatsoever, including real property taxes, personal property taxes, income taxes, employment taxes, and sales or use taxes, that are taxed, assessed, levied, invoiced or imposed upon or against the Leased or Licensed Assets, the Hospital, and/or Randolph, after the Closing Date.

**4.3    Insurance.** Buyer shall pay for all insurance coverages, including premiums, deductibles, stop-loss, and any other insurance covering the Leased or Licensed Assets, the Licensure Date Assets, the Hospital, and Randolph during the term hereof. Buyer covenants and agrees that the Leased or Licensed Assets, the Licensure Date Assets, the Hospital, and Randolph are covered as of the date hereof and will be covered at all times by general liability, fire, theft, business interruption, cyber, professional liability, directors and officers insurance, employment practices liability, terrorism, workers' compensation & employers' liability, directors and officers, fiduciary, crime, punitive damages excess liability, physical damage, property liability, automobile, storage tank, helipad and non-owned aviation, sexual misconduct and molestation, medical provider professional liability, and provider capitation stop loss (managed care excess loss) insurance. All such insurance shall name Buyer and Randolph as insureds as their respective interests may appear.

**4.4    Repairs and Maintenance: Alterations.** During the term of this Leaseback Agreement, Buyer shall pay all costs of repairing (including replacement of) and maintaining the Leased or Licensed Assets and Hospital and every part thereof in good and sanitary order, condition and repair during the term hereof, including, without limitation, all costs of all repairs, replacements and maintenance required by any applicable governmental law, statute, ordinance, rule or regulation. Randolph shall not make any alterations or changes to the Leased or Licensed Assets without prior written approval of Buyer, which may be given or withheld in Buyer's sole discretion.

**4.5    Payment.** Nothing in this Section 4 shall in any way limit, reduce, or otherwise affect Buyer's payment obligations under the IMA or the APA.

**5.    Use.** The Leased or Licensed Assets shall be used for the operation of the Hospital, subject to the terms of the APA and the IMA.

**6.    Risk of Loss.**

3

**6.1**     Randolph assumes no risks or liability for damage to or injury occurring on or to the Leased or Licensed Assets or Hospital during the term of this Leaseback Agreement by any means whatsoever, including fire, storm, earthquake, vandalism, strike, accident or any other casualty (collectively, "**Casualty**"), and Buyer shall have all right, title, and interest in and to the proceeds of any insurance it obtained and paid for covering such Casualty.

**6.2**     If, during the term of this Leaseback Agreement, action is initiated to take the Hospital Premises or any portion thereof by eminent domain or condemnation proceedings, exercise of state authority under an executive order or by deed in lieu thereof (collectively, "**Condemnation**"), Buyer, and not Randolph, shall have all right, title, and interest in and to the award from the Condemnation.

**6.3**     In the event of a Casualty or Condemnation, neither Buyer nor Randolph may terminate this Leaseback Agreement.

**7.**     **Continued Access.** As may be applicable following termination of this Leaseback Agreement, and until the entry of final decrees closing the Bankruptcy Cases, the Patient Care Ombudsman, appointed by the United States Trustee pursuant to Bankruptcy Code § 333 and approved by the Bankruptcy Court, shall have continuing access to the Leased or Licensed Assets and related personnel during normal business hours and upon at least one (1) business day's prior written notice to Buyer, for the purpose of winding down Randolph's affairs, in connection with any litigation or adversary proceedings, and to effectuate the chapter 11 plan as approved by the Bankruptcy Court.

**8.**     **Miscellaneous.**

**8.1**     **Further Assurances.** Each of the Parties hereto agrees to execute and deliver any and all further agreements, documents or instruments necessary to effectuate this Leaseback Agreement and the transactions referred to herein or contemplated hereby or reasonably requested by the other Party to perfect or evidence their rights hereunder.

**8.2**     **Notices and Demands.** All notices and demands, requests, consents, approvals, and other similar communications under this Leaseback Agreement shall be in writing and shall be sent by personal delivery or by either (a) United States certified or registered mail, return receipt requested, postage prepaid, or (b) Federal Express or similar generally recognized overnight carrier regularly providing proof of delivery, addressed as follows:

If to Randolph, addressed to:

Randolph Hospital, Inc.
364 White Oak Street
Asheboro, North Carolina  27203
Attention: Louis E. Robichaux IV
Chief Restructuring Officer
Facsimile: (336) 626-7664
Telephone: (214) 924-1575
Email: louis.robichaux@ankura.com

with a copy to counsel for Randolph,

Nelson Mullins Riley & Scarborough LLP

4

| which shall not constitute notice, to: | Glenlake One, Suite 200 |
|---|---|
| | 4140 Parklake Avenue |
| | Raleigh, North Carolina 27612 |
| | Attention: Robert L. Wilson, Jr. |
| | Facsimile: (919) 329-3799 |
| | Telephone: (919) 329-3870 |
| | Email: bob.wilson@nelsonmullins.com |
| If to Buyer, addressed to: | American Healthcare Systems, LLC |
| | Attn: Michael Sarian |
| | 1901 Avenue of the Stars |
| | Suite 1060 |
| | Los Angeles, CA 90067 |
| with a copy to counsel for Buyer, which shall not constitute notice, to: | Gill Law Firm, LLP |
| | 1901 Avenue of the Stars |
| | Suite 1060 |
| | Los Angeles, CA 90067 |
| | Attention: Faisal Gill |
| | Telephone: (310) 418-6675 |
| | E-mail: fgill@glawoffice.com |

Any notice so given by mail shall be deemed to have been given as of the date of delivery (whether accepted or refused) established by U.S. Post Office return receipt or the overnight carrier's proof of delivery, as the case maybe, whether accepted or refused. Any such notice not so given shall be deemed given upon receipt of the same by the Party to whom the same is to be given. Any Party hereto may designate a different address for itself by notice to the other Parties in accordance with this Section 8.2.

**8.3** **Payment of Expenses.** Except for Buyer's obligation to be responsible for certain costs, fees, and expenses as set forth elsewhere in this Leaseback Agreement, each Party hereto shall bear its own legal, accounting, and other expenses incurred in connection with the preparation and negotiation of this Leaseback Agreement and the consummation of the transactions contemplated hereby, whether or not the transaction is consummated.

**8.4** **Rent.** Randolph has prepaid the sum of One Hundred Dollars ($100.00), the receipt of which is hereby acknowledged by Buyer, and Randolph shall not be required to pay Buyer any additional rent under this Leaseback Agreement.

**8.5** **Entire Agreement; Amendment; Waiver.** This Leaseback Agreement, the IMA, and those provisions of the APA expressly identified in this Leaseback Agreement contain the entire agreement among the Parties with respect to the subject matter hereof and supersede all prior agreements, arrangements, and understandings relating to the subject matter hereof and thereof. There are no written or oral agreements, understandings, representations, or warranties among the Parties other than those set forth in this Leaseback Agreement, the IMA, and those provisions of the APA expressly identified in this Leaseback Agreement. Nothing in this Leaseback Agreement modifies or shall be construed as modifying any orders entered by the

5

Bankruptcy Court. This Leaseback Agreement may not be modified or amended except in writing signed by the Parties. No waiver of any term, provision or condition of this Leaseback Agreement in any one or more instances, shall be deemed to be or be construed as a further or continuing waiver of any such term, provision or condition of this Leaseback Agreement. No failure to act shall be construed as a waiver of any term, provision, condition or rights granted hereunder.

**8.6    Assignment.** Neither this Leaseback Agreement nor the rights, duties or obligations arising hereunder shall be assignable or delegable by Randolph or Buyer without the prior written consent of the other Party, which may be granted, denied or conditioned in such Party's absolute discretion except that Buyer may assign this Leaseback Agreement in connection with any permitted assignment under the IMA. Subject to the foregoing, this Leaseback Agreement shall be binding upon, and inure to the benefit of, the respective successors and assigns of the Parties.

**8.7    Joint Venture; No Third-Party Beneficiaries.** Nothing contained herein shall be construed as forming a joint venture or partnership among the Parties with respect to the subject matter hereof. The Parties do not intend that any third party shall have any rights under this Leaseback Agreement.

**8.8    Captions.** The section headings contained herein are for convenience only and shall not be considered or referred to in resolving questions of interpretation.

**8.9    Governing Law.** This Leaseback Agreement shall be governed by and construed in accordance with the laws of the State of North Carolina without regard to its conflicts of laws principles or decisions, except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable federal law.

**8.10 Jurisdiction.** The Parties agree that the Bankruptcy Court shall have exclusive personal and subject matter jurisdiction over any action or proceeding with respect to any claim arising out of or related to this Leaseback Agreement, and any of the documents or transactions contained in or contemplated by this Leaseback Agreement; *provided, however*, that the Parties agree that the United States District Court for the Central District of North Carolina (together with the Bankruptcy Court, the "**Chosen Courts**") shall have exclusive jurisdiction over such claim if (i) the Bankruptcy Cases are closed and if the Bankruptcy Cases are not reopened to adjudicate such claim after request by the Party bringing such claim, or (ii) the Bankruptcy Court determines that it does not have jurisdiction over such claim. Solely in connection with claims arising under this Leaseback Agreement, or any of the documents or transactions contemplated hereby, the Parties (a) irrevocably submit to the exclusive jurisdiction of the Chosen Courts, (b) waive any objection to laying venue in any such action or proceeding in the Chosen Courts, (c) waive any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party hereto, and (d) agree that service of process upon such Party in any such action or proceeding shall be effective if notice is given in accordance with Section 8.2 hereof.

**8.11 Conditions to Effectiveness.** The Parties acknowledge that this Leaseback Agreement is subject to and contingent upon the occurrence of the Closing under the APA. This

Leaseback Agreement shall not be effective, nor shall any Party have any obligations hereunder, unless and until the Closing under the APA has occurred.

 **8.12 Cooperation on Regulatory Compliance Matters.** Buyer understands and acknowledges that Randolph intends to comply with applicable federal and state laws, regulations, and guidance, as well as the requirements or recommendations of any accrediting agencies. In the event the terms of this Leaseback Agreement need to be amended or supplemented based on guidance from or at the request or direction of a regulator made during the term of this Leaseback Agreement, Buyer shall cooperate with such amendment and/or supplement to ensure Randolph's ability to comply with such guidance, request, recommendation or directive.

 **8.13 Fair Meaning.** This Leaseback Agreement shall be construed according to its fair meaning and as if prepared by all Parties.

 **8.14 Counterparts.** This Leaseback Agreement may be executed by one or more of the Parties on any number of separate counterparts (including by telecopy), and all of said counterparts taken together shall be deemed to constitute one and the same instrument. This Leaseback Agreement may be delivered by facsimile or electronic transmission, including by e-mail as a PDF, and facsimile or PDF copies of executed signature pages, which shall be binding as originals.

 **8.15 WAIVER OF JURY TRIAL. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (B) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 8.15. THIS IS AN AFFIRMATIVE WAIVER OF THE PARTIES' RIGHTS TO A JURY TRIAL. BY SIGNING BELOW ON THE SIGNATURE LINES, EACH PARTY IS EXPLICITLY WAIVING JURY TRIAL AND AUTHORIZING ANY AND ALL PARTIES TO FILE THIS WAIVER WITH ANY COURT.**

*[Signature Page Follows.]*

**IN WITNESS WHEREOF,** the Parties agree to the foregoing terms of agreement through the execution below by their respective, duly authorized representatives as of the Signing Date.

**RANDOLPH:**

**RANDOLPH HOSPITAL, INC., d/b/a RANDOLPH HEALTH,**
a North Carolina nonprofit corporation

By:_____
Name:_____
Title:_____

**RANDOLPH SPECIALTY GROUP PRACTICE,**
a North Carolina nonprofit corporation

By:_____
Name:_____
Title:_____

**MRI OF ASHEBORO, LLC, d/b/a RANDOLPH HEALTH MRI CENTER,**
a North Carolina limited liability company

By:_____
Name:_____
Title:_____

**BUYER:**

**AMERICAN HEALTHCARE SYSTEMS, LLC,**
a Virginia limited liability company

By:_____
Name:_____
Title:_____

8